**UNITED STATES of America,
Appellee,**

v.

**Marion Lee (Bill) IVEY and J. R. (Dick)
Owen, Appellants.**

**No. 8854.**

United States Court of Appeals
Fourth Circuit.

Argued June 6, 1963.

Decided Sept. 10, 1963.

Thomas F. Ellis, Raleigh, N. C., for appellant Marion Lee (Bill) Ivey (William A. Taylor, Dunn, N. C., on brief) for appellants.

Eugene H. Phillips, Winston Salem, N. C., for appellant J. R. (Dick) Owen.

William H. Murdock, U. S. Atty., and Roy G. Hall, Jr., Asst. U. S. Atty., for appellee.

Before HAYNSWORTH and BOREMAN, Circuit Judges, and BARKSDALE, District Judge.

BARKSDALE, District Judge.

Marion Lee (Bill) Ivey and J. R. (Dick) Owen have prosecuted this appeal from judgments of conviction entered by the District Court for the Middle District of North Carolina, at its November Term

1962, in Winston-Salem, upon a jury's verdict finding both of them guilty as to both counts of a two-count indictment charging violations of 18 U.S.C.A. § 1001. Sentences of imprisonment were imposed on each defendant. The indictment was as follows:

## "FIRST COUNT

"On or about the 26th day of October, 1959, in the Middle District of North Carolina, Marion Lee (Bill) Ivey and J. R. (Dick) Owen knowingly and wilfully falsified, concealed, and covered up by trick, scheme, and device a material fact in a matter within the jurisdiction of the Department of Agriculture of the United States in that they falsely identified and marketed, or caused the false identification and marketing, of 5,464 pounds of flue-cured tobacco through the facilities of Grower's Warehouse, Mebane, North Carolina, on a within quota marketing card for flue-cured tobacco issued to Marion Lee (Bill) Ivey for use in identifying 1959 flue-cured tobacco produced on Harnett County Farm No. N-7117, when in truth and fact the said Marion Lee (Bill) Ivey and J. R. (Dick) Owen well knew that said tobacco was not produced on Harnett County Farm No. N-7117.

## "SECOND COUNT

"On or about the 2 day of November, 1959, in the Middle District of North Carolina, Marion Lee (Bill) Ivey and J. R. (Dick) Owen knowingly and wilfully falsified, concealed, and covered up by trick, scheme, and device a material fact in a matter within the jurisdiction of the Department of Agriculture of the United States in that they falsely identified and marketed, or caused the false identification and marketing, of 8,632 pounds of flue-cured tobacco through the facilities of Brown's Warehouse, Winston-Salem, North Carolina, on a within quota marketing card for 1959 flue-cured tobacco issued to Marion Lee (Bill) Ivey for use in identifying 1959 flue-cured tobacco produced on Harnett County Farm No. N-7117, when in truth and fact the said Marion Lee (Bill) Ivey and J. R. (Dick) Owen well knew that said tobacco was not produced on Harnett County Farm No. N-7117."

The statute, 18 U.S.C.A. § 1001, is as follows:

"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both. June 25, 1948, c. 645, 62 Stat. 749."

The defendants did not testify nor introduce any evidence in their own behalf. Since the jury found them guilty, and the court entered judgments of conviction on the jury's verdict, under the familiar rule we must view the evidence in the light most favorable to the Government and draw reasonable inferences from it.

During the year 1959, the marketing of tobacco in North Carolina was conducted under the authority of the Agricultural Adjustment Act of 1938 as amended, and under the authority of this Act, a quota program was established in order to limit the production of tobacco, and as compensation for limited production, support prices were established which guaranteed to farmers the payment of the support prices for tobacco produced within the established quotas. The administration of the program was entrusted to the Agricultural Stabilization and Conservation Service, an agency of the United States Department of Agricul-

ture. Under the regulations issued by the Secretary of Agriculture, the Agricultural Stabilization and Conservation County Committees were charged with the administration of the tobacco marketing quota program at the county level. The County Committee's established the tobacco allotments for farms in their counties, based on past production and on measurements made on each farm by a representative of the County Committee. Each farm was given a serial number and a tobacco marketing card was issued to each farm operator. This was known as a "Within Quota Marketing Card", its purpose being to identify at the time of marketing the tobacco produced on the allotted acreage of the farm for which the card was issued. When tobacco was marketed from a farm having a tobacco quota, a record of such sale was recorded on the marketing cards. Each and every sale by a producer was required to be recorded. When a farmer holding a within quota card had finished the sale of his crop, he was required to turn in his within quota card to the County Committee. When a farmer made a sale of tobacco at a warehouse, he was required to produce his within quota marketing card so that his sale might be recorded on the card by an agent of the County Committee, and it was necessary that this be done before the farmer could be paid for his tobacco. It was contrary to the regulations of the Department of Agriculture to market tobacco by the use of a within quota marketing card, unless the tobacco marketed was grown on the farm for which the card was issued. The quota system, and the honest use of the marketing cards, were important elements in the administration of the Agricultural Adjustment Act.

During the year 1959, Owen, in partnership with two others, operated Growers Warehouse at Mebane, N. C., and he also had a leaf account with the warehouse, which gave him the privilege of buying and selling tobacco. Owen's father was a licensed dealer, having a dealer's book entitling him to buy and sell tobacco on the warehouse floor, and Owen operated as a dealer in the name of his father. No point was made of this irregularity. Ivey was a farmer, and for the year 1959 he and R. D. Lee had leased a large tobacco farm in Harnett County, N. C. The actual growing of the tobacco was done by some nine sharecroppers under the supervision of Ivey. This farm had a tobacco allotment of forty-seven acres and was assigned the number N-7117. Ivey reported to Lee that the farm had produced 56,336 pounds of tobacco. At the end of the season, Ivey's marketing card showed that a total of 93,000 pounds of tobacco was marketed from Farm No. N-7117.

From the evidence pertaining to count one of the indictment, the jury might have found the following facts: Prior to October 26, 1958, Owen, as a dealer, had bought at Growers Warehouse on his leaf account $9,352.30 worth of tobacco, and 5,467 pounds in addition, which he kept stored in a particular place on the warehouse floor. On October 26, 1959, Owen had weighed 5,464 pounds of leaf tobacco and had it placed on the warehouse floor in the name of Ivey. This tobacco was that day sold for the net amount of $2,941.70, and the bookkeeper delivered to Ivey on that same day a check for that amount payable to his order. The following day, Owen gave Rummage, one of his partners in the warehouse operation, $2,941.70 to be applied as a credit on his leaf account with the warehouse. Ivey's within quota marketing card showed sales at Growers on that day, October 26th, of 9,116 pounds of leaf tobacco, and three warehouse "floor sheets" for that day showed the sale of 5,464 pounds of leaf tobacco. Under the regulations, Owen was required to report all his purchases and sales, and he did make certain reports. However, he made no report of any sale at Growers Warehouse on October 26, 1959.

As to the second count of the indictment, the jury would have been justified in finding the following facts: From September 14, 1959, through October 30, 1959, Owen had purchased $16,912.34

worth of leaf tobacco at Growers Warehouse, and one lot of 5,467 pounds in addition. Owen kept this tobacco stored in a particular place on the warehouse floor, and made sales of it from time to time. On Sunday, November 1, 1959, Owen had loaded from his stock of dealer tobacco a large load, estimated by those who saw it to be from 7,000 to 9,000 pounds and took it to Brown's Warehouse in Winston-Salem. The previous day, Owen had made arrangements through the auctioneer of Brown's Warehouse for space on the warehouse floor. When this truck load of tobacco arrived at Brown's Warehouse in Winston-Salem, Owen and Ivey unloaded it. The next day, Monday, both Owen and Ivey came to Brown's Warehouse and stayed all day. The tobacco which they had brought was sold between 3:00 and 4:00 o'clock in the afternoon. All this tobacco was sold in the name of Ivey, and Ivey was present at the time of the sale. The warehouse "floor sheets" for this tobacco were in Ivey's name, and Ivey's within quota marketing card showed the sale of 9,420 pounds of leaf tobacco at Brown's Warehouse in Winston-Salem on November 2, 1959. Although Owen, as a dealer, was required to report all purchases and sales, he made no report of any sale at Brown's Warehouse in Winston-Salem on November 2, 1959.

These facts amply justified the jury in finding that, on the two occasions set out in the indictment, Ivey and Owen "falsely identified and marketed, or caused the false identification and marketing" of the quantities of tobacco set out in the indictment by the dishonest use of Ivey's within quota marketing card.

There was evidence from which the jury might have inferred that Ivey marketed on his within quota marketing card approximately 36,000 pounds of tobacco more than he produced on his allotted acreage. There was no definite proof of the origin of the two lots of tobacco set out in the indictment. However, we hold that to be immaterial, because it was definitely proven that when the two lots of tobacco were sold they constituted "dealer tobacco", the property of Owen, had been commingled with his other "dealer tobacco", and had completely lost its identity as the tobacco of any grower.

Ivey and Owen contend that the evidence was not sufficient to prove a violation of the statute (18 U.S.C.A. § 1001) by either of them, because there was no evidence that either—

"(1) submitted the quota card to anyone in connection with either sale.

"(2) ever made any entry of any kind thereon or on any card, bill or other paper, whether true or false.

"(3) made any statement or representation, true or false, verbal or written, to any person with respect thereto.

"(4) used any card, entry or paper notation of any kind during the course of either sale.

"(5) ever came in contact with any government employee at any time during the course of either sale, or that anyone on their behalf had such contact.

"(6) made any statement or representation of any kind to any government employee or representative about any matter pertaining to either sale.

"(7) concealed any facts, material or otherwise, from any government employee or representative."

We cannot agree with these contentions, or any of them. There was ample evidence to prove that, in both instances, dealer tobacco of Owen, at the instance of Ivey or Owen or both, was ticketed with warehouse floor sheets in the name of Ivey, sold in Ivey's name, and that, after the sales, Ivey's within quota marketing card was presented to an agent of the County Committee of the Agricultural Stabilization and Conservation Service, who recorded the two sales on Ivey's within quota marketing card. The evidence further shows that Ivey mailed his within quota marketing card to the County Committee in the late fall of 1959.

Defendants rely heavily on United States v. Gilliland, 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598, although actually the case does not support their contentions at all. The District Court had sustained a demurrer to eight counts of an indictment charging that defendants had "wilfully caused to be made and used verified reports falsely and fraudulently stating the amount of petroleum produced from certain oil wells, \* \* \*". Thus it is obvious that the indictment was drawn under the third clause of the statute and not the first clause as in the instant case. Although the statute has been amended from time to time, then as now, the first clause has nothing to do with any false writings or false documents of any kind: the first clause, under which the present indictment was drawn, inhibits the knowing and wilful falsification, concealment or covering up by any trick, scheme or device of a material fact. In Gilliland, the Court reversed the District Court, holding that the indictment was good and said (312 U.S. p. 93, 61 S.Ct. p. 522, 85 L.Ed. 598):

" \* \* \* The statute was made to embrace false and fraudulent statements or representations where these were knowingly and willfully used in documents or affidavits 'in any matter within the jurisdiction of any department or agency of the United States.' In this, there was no restriction to cases involving pecuniary or property loss to the government. The amendment indicated the congressional intent to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described. We see no reason why this apparent intention should be frustrated by construction. \* \* \*"

Other cases cited and relied upon by appellants do not support their contentions. It would serve no useful purpose to review all of them: comment on the principal ones would seem to be sufficient.

In Freidus v. United States, 96 U.S. App.D.C. 133, 223 F.2d 598, a conviction was reversed by reason of the conclusion of the Court of Appeals that the statement relied on by the Government was not materially false and that there was insufficient proof of criminal intent. The Court said (223 F.2d p. 601):

"That purpose (the purpose of the statute), as expressed by the Supreme Court in United States v. Gilliland, was 'to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described.' No perversion of a governmental function could possibly result from a false statement that was incapable of affecting or influencing such function."

In Paternostro v. United States (5 Cir.), 311 F.2d 298, the conviction was reversed for the reason that defendant's negative answers to questions propounded by a government agent were insufficient to constitute statements within the statute. The court said:

"The appellant in the case at bar made no statement relating to any claim on his behalf against the United States or an agency thereof; he was not seeking to obtain or retain any official position or employment in any agency or department of the Federal Government; and he did not aggressively and deliberately initiate any positive or affirmative statement calculated to pervert the legitimate functions of Government. At most, assuming that appellant's answers to the agent were proved to be false by believable or substantial evidence, considering all he said, the answers were mere negative responses to questions propounded to him by an investigating agent during a question and answer conference, not initiated by the appellant."

In United States v. Stark (D.C.Md.), 131 F.Supp. 190, the court held that false answers given to F.B.I. agents during an investigation initiated and conducted by them did not constitute "statements"

within the meaning of the statute. The opinion recites (131 F.Supp. p. 205):

> "Running through the whole Act there seems to be discussed the congressional purpose to (1) protect the government against false pecuniary claims and (2) as stated in the Gilliland case, to protect governmental agencies from perversion of their normal functioning. The purpose seems to be to protect the government from the affirmative or aggressive and voluntary actions of persons who take the initiative, or, in other words, to protect the government from being the victim of some positive statement, whether written or oral, which has the tendency and effect of perverting its normal proper activities. In the instant case the defendants did not volunteer information, they were not seeking any action by the government or making any claim upon it, or for action by its officers against other persons."

Government counsel have cited no case precisely in point, nor have we been able to find one. Although not in point here, a case involving Government price supports in the marketing of flue-cured tobacco, came before this court in Commodity Credit Corporation v. Worthington (4 Cir.), 263 F.2d 178. The court said (263 F.2d p. 179):

> "For the purpose of stabilizing farm income and prices, the Commodity Credit Corporation was created as an agency and instrumentality of the United States within the Department of Agriculture. 15 U.S.C.A. § 714. Among the Corporation's specific powers is the power to support farm prices through the purchase of farm commodities. * * *
>
> "While the Government is entitled to recourse through the cooperatives against the warehouse man in the event of loss through the purchase of misgraded or mislabelled tobacco, the success of the entire program depends upon the orderly and respon-

sible marketing of tobacco, and Commodity Credit Corporation certainly has a sufficient interest to justify its insistence that the warehouses be honestly operated."

It seems to us that the following cases support the conviction of appellants.

In United States v. Belville (D.C.S.D. W.Va.), 82 F.Supp. 650, it was held that the evidence warranted conviction of a tobacco dealer for falsifying bill of non-warehouse sale of tobacco and for falsely reporting his purchases and resales of tobacco to the Department of Agriculture in violation of the Agricultural Adjustment Act. As reported, the opinion is only the court's special findings of fact, the defendant having been tried by the court without a jury. It does not specifically appear that the conviction of the defendant was based on a violation of 18 U.S.C.A. § 1001, although it is so indicated. The court said (82 F.Supp. p. 651):

> "In order to avoid payment of the penalty on non-quota tobacco purchased by him, the defendant caused the amount of tobacco shown on the white quota memorandum sales slips to be increased, altered and forged. Thereafter he sold non-quota tobacco purchased from one farmer upon the quota card of another farmer, thereby avoiding payment of any penalty. These white quota marketing cards or sales memoranda, so altered and forged, and containing a false statement as to the amount of penalty-free tobacco purchased from the various farmers mentioned in the indictment, were thereafter filed or caused to be filed by the defendant with the field representative authorized to accept delivery of such cards for and on behalf of the Department of Agriculture, the defendant then and there knowing that said bills of non-warehouse sales were false."

In Morgan v. United States (9 Cir.), 301 F.2d 272, a conviction was sustained upon an indictment charging a violation of the second clause of 18 U.S.C.A. § 1001. Although this case involved the mar-

keting of cotton, it appears that cotton was being marketed in Arizona under a Government support program with acreage allotments and marketing quotas similar to the tobacco support program, both being administered under the Agricultural Stabilization and Conservation Service. The evidence showed that defendant in 1958 planted in cotton an acreage in excess of his allotment and produced cotton in excess of his farm's marketing quota. Defendant made a statement to an agent of the County Committee that in that year he had produced 55 bales (25,665 pounds) of cotton, when in fact he had produced 59 bales (27,612 pounds) of cotton. It does not appear whether defendant's false statement was verbal or in writing. It does appear that the defendant had paid in full the penalty to which he became subject by reason of his excess production. The Government suffered no loss by reason of the defendant's false statements, but the court held that loss or damage to the Government was not an essential ingredient of the offense charged. The situation in this case seems quite analogous to the instant case, although the indictment was drawn under the second clause of the statute, and in the instant case a violation of the first clause was charged.

See also Apel v. United States (8 Cir.), 247 F.2d 277, where a conviction under the Act was sustained where defendant had delivered to Commodity Credit Corporation corn mortgaged by him under Government price-support loans for the purpose of satisfying such loans, and had included in his delivery under each loan, corn not covered by the mortgage, and had wilfully and knowingly failed to disclose this fact to the agents of the Commodity Credit Corporation in order that he might receive payment for the excess corn at the Government's settlement value.

On the question of materiality, the court charged the jury:

"An accurate record of tobacco produced and marketed, as evidenced by these sales recorded on the within quota marketing card, is material to the administration of the marketing program provided for by the Agricultural Adjustment Act. It is not permissible under the regulations of the Department of Agriculture to market tobacco by the use of a within quota marketing card where the tobacco marketed was not grown on the farm for which the card was issued, and the Court instructs you that as a matter of law any false representation or concealment of the true farm upon which marketing tobacco is produced when a within quota marketing card is used to market the tobacco, if knowingly and wilfully made or concealed, would be a material fact within the meaning of the Indictment and the Statute under which it is drawn."

Defendants excepted to this part of the charge, contending that "materiality" was a question of fact for the jury, rather than a question of law for the court. In their brief, counsel for defendants renew this contention, although they admit that, by the weight of authority, the question of materiality is a question of law. We hold that the question of materiality was a question of law in this case, and that the court's charge was proper. Sinclair v. United States, 279 U.S. 263, 298, 49 S.Ct. 268, 73 L.Ed. 692; Weinstock v. United States, 97 U.S.App.D.C. 365, 231 F.2d 699, 701; United States v. Clancy (7 Cir.), 276 F.2d 617, 635.

Additionally, defendants here contend that the proof is insufficient to establish materiality. With this contention we disagree. It seems so obvious that the honest and accurate use of the quota card is such an important and material factor in the administration of the flue-cured tobacco marketing program as to hardly require demonstration. The record of tobacco sales from a farm for one year, is an important factor in the allotment of acreage for the ensuing year. Tobacco allotments are of acreage, and not of pounds of tobacco. This is necessarily so, because no one can foretell how

many pounds of tobacco a given acreage will produce in a given year. The accurate use of the quota card is essential to the success of the program. If holders of within quota marketing cards marketed excess tobacco, that is, tobacco grown on acreage not included in their allotments, or tobacco of others having no allotment, by using their within quota cards, the whole scheme of support prices would be frustrated.

There can be no question that the marketing of tobacco under the Agricultural Adjustment Act was a "matter within the jurisdiction of" a department of the United States, i. e., the Department of Agriculture.

It follows that the judgment of the District Court will be

Affirmed.