UNITED STATES of America, Plaintiff-Appellee,

v.

George PHILLIPS, Defendant-Appellant.

No. 78–5114.

United States Court of Appeals, Fifth Circuit.

Aug. 9, 1979.

Lester Makofka, Jacksonville, Fla. (Court-appointed), for defendant-appellant.

Gary L. Betz, U. S. Atty., Loretta Anderson, Asst. U. S. Atty., Jacksonville, Fla., for plaintiff-appellee.

Before GEWIN, COLEMAN and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge.

George Phillips drives a cement truck for a living. In July, 1972, he was hospitalized because of a condition called atriofibrillation—a rapid, irregular heart beat—accompanied by heart failure and lung congestion. These afflictions forced him to stop working for some months. In October of that year he applied for social security disability benefits. In March, 1973, the Social Security Administration (SSA) awarded him disability benefits, retroactive to January, 1973. In the meantime, Phillips had begun working again, although not at the pace he maintained before his illness; indeed during several weeks he did not work at all. But until March, 1974, about eighteen months after he resumed work, he did not tell the SSA that he was again working. In October, 1974, his benefits were terminated. Three years later he was charged with a misdemeanor for having failed to notify the SSA about his employment between November, 1972 and March, 1974. He was convicted by a jury and he now appeals. We reverse.

Phillips was convicted under 42 U.S.C. § 408(d), which provides:

Whoever . . . having knowledge of the occurrence of any event affecting (1) his initial or continued right to any payment under this subchapter . . . conceals or fails to disclose such event with an intent fraudulently to secure payment either in a greater amount than

is due or when no payment is authorized . . . shall be guilty of a misdemeanor . . . .

Phillips does not deny that his employment was substantial and prolonged enough to affect his right to disability payments. Of course he does not deny that he knew he was employed; and he admits that he first told the Social Security Administration about his employment in March of 1974, even though he had been working, on and off, since November 1972. The only remaining question under § 408(d) is whether Phillips had "an intent fraudulently to secure payment." We hold that the government did not adduce enough evidence that Phillips had such a fraudulent intent.

"Fraudulent intent" under § 408(d) has never been authoritatively defined. Indeed § 408(d) is apparently the basis for few prosecutions and seems seldom to have been interpreted. In this case, however, the trial judge, the prosecution, and the defense all seem to agree on what constitutes fraudulent intent, and we believe their interpretation of the statute is correct. First, the government must show that the defendant knew that he was legally obligated to disclose certain information. Second, the government must prove that the defendant knew that by withholding the information he would receive greater payments than he was entitled to. In other words, a defendant is not guilty under § 408(d) unless he is aware both that he is deceiving the government and that the government will pay out more money because of his deception. *Cf.* Restatement of Torts, § 525 (1939) (to be guilty of deceit, defendant must have intended that plaintiff rely on defendant's misrepresentation).

The second element is apparent on the face of the statute; Congress required an intent "to secure payment . . . in a greater amount than is due," and a de-

---

**1.** Literally, or literalistically, a statute requiring "an intent . . . to secure payment . . .

in a greater amount than is due" might be satisfied by an intent to secure any payment

fendant cannot intend a consequence—here, receiving a greater amount than is due[1]— unless he knows, or can reasonably be charged with knowing, that his action would have that consequence. The first element is almost equally apparent. Congress required a certain "intent," choosing not to punish careless failures to disclose; the nondisclosure must be deliberate. Congress also required an "intent *fraudulently* to secure payment . . . in a greater amount than is due" (emphasis added). Congress must, therefore, have wanted to exempt recipients who deliberately failed to disclose certain information because they intended to increase their payments, but whose intention was nonetheless innocent. A recipient who thought he was entitled not to disclose would fall in this category. Finally, whatever else it involves, fraud is a matter of deliberate deception. But if a defendant does not know that the government expects him to reveal certain information, then he does not know that the government will be misled by not receiving it; so if he has deceived the government, he has not done so deliberately, and he cannot be said to have acted with a fraudulent intent.[2]

Phillips's application for disability benefits specified that he was to notify the Social Security Administration if he became able to work or returned to work. Phillips, who has only a sixth-grade education, signed the application, but he testified that he did not read it; it was filled out by a Social Security representative to whom he supplied the necessary information. That representative testified that she could not remember Phillips specifically but that as a general practice she asked applicants, among other questions, whether they agreed to notify the SSA if they returned to. work. Phillips testified that he did not remember that question.

On the basis of his October, 1972, application and some medical reports, Phillips was awarded disability benefits in March, 1973, retroactive to January, 1973. In January, 1974, the SSA sent Phillips a letter and a questionnaire, asking for the names of doctors he had consulted and asking if he had done any work. This was part of a routine reconsideration the SSA undertook because it thought Phillips had the kind of condition that was likely to improve. On February 7 the SSA, having received no reply, sent another letter.[3] When it still did not receive a reply, the SSA sent a representative, Michael J. Wolpert, to call on Phillips at his home. Agent Wolpert testified that Phillips told him he was working eight hours a day, two to five days a week, and that he did not remember exactly when he had begun working. Wolpert also reported that Phillips was earning more than $200 a month. Wolpert told Phillips that his payments would probably be terminated, but testified that had he been asked, which he was not, he would have advised Phillips to cash the checks he was receiving and not to return them, "because as far as I knew he was not found . . . rehabilitated, that or found un-disabled. As far as I knew at that point he was still disabled." Agent

which is in fact greater than the amount due. That is, it might require only proof that the defendant knew he would receive payments, not proof that he knew the payments were greater than the amount due. This interpretation would differ from that proposed in the text in only one respect. It would reach a defendant who knew he had a duty to disclose certain information, and knew that by not disclosing he could increase his payments, but thought—honestly although mistakenly—that he was entitled to the greater payments. Whether Congress intended to cover this unlikely case is an issue we need not decide here.

**2.** *See also United States v. Bishop,* 412 U.S. 346, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973), which held that the requirement of a "willful" act or omission, generally found in 26 U.S.C. §§ 7201–7207, the principal statutes dealing with federal income taxpayers' criminal liability, can be satisfied only by showing "a voluntary, intentional violation of a known legal duty." *Id.* at 360, 93 S.Ct. at 2017.

**3.** There was testimony that state agencies also sent Phillips two letters.

Wolpert was quite emphatic on this point. *See* R.Vol. 4 at 65–66.

As a result of Wolpert's interview report, the SSA inquired of Phillips's employer and learned that Phillips had been working irregularly since October, 1972. In October of 1974, the SSA decided that its original decision to award Phillips disability benefits was mistaken and it terminated his benefits.

For the next two years the SSA seems to have had no contact with Phillips. Then in October, 1976, another SSA representative, Ms. Eloise Mobley, interviewed Phillips at his home. Agent Mobley's testimony was the heart of the government's effort to show that Phillips acted fraudulently. Mobley's testimony is questionable for several reasons,[4] but these need not detain us. She testified:

> He stated that he had been told at the initial interview that if he should return to work or if his condition improved, that he was supposed to report this to the Administration. He felt the reason why he did not report his return to work was because he felt that the check he was going to receive on disability, that he was receiving, was rightfully his, regardless of whether he worked or not.

Q Did Mr. Phillips indicate during the course of his interview that he understood the meaning of disability?

A Yes, he did.

Q Did he give a reason as to why he did not report the work activity to the Social Security Administration?

A Well, his reason was that, you know, he had worked and paid into the Social Security fund and disability had already been established for him so, you know, whether he worked or not, these checks were rightfully his.

Q Did you ask Mr. Phillips if he intended to refund the overpayment?

A Yes, I did ask him.

Q And what, how did he respond?

A Without hesitation he said no.

Q Did you ask Mr. Phillips if he reported that he had worked to the Social Security Administration?

A Yes, I did.

Q And what did he answer?

A He said no.

R.Vol. 4 at 96–97.

This evidence, taken together, can support a jury's conclusion that Phillips knew he had an obligation to report his resumed employment. The jury might have decided to discount Phillips's testimony on this point in the face of the application, the testimony of the agent who filled it out, and Agent Mobley's directly contradictory recollection.

■■ But the evidence of the other element of fraudulent intent—that Phillips knew he was not entitled to the payments he was receiving—is far too threadbare. The government stresses Agent Mobley's testimony that Phillips "indicated" that he "understood the meaning of disability," but this alone cannot suffice. In the first place, this testimony may be inadmissible; arguably, it "amount[ed] to little more than choosing up sides" on an ultimate issue of fact, Fed.R.Evid. 701, Advisory Comm. Note, precisely what the Federal Evidence

---

4. Agent Mobley recounted her conversation with Phillips at a suppression hearing before a magistrate and again at a hearing before the district judge. There were several significant inconsistencies in her accounts. *Compare* R.Vol. 2 at 36–38 (Phillips refused to sign waiver of rights *before* being questioned) with R.Vol. 3 at 18–20, 23, 30, 32, 34 (*after* being questioned); R.Vol. 2 at 28, 29, 32 (Phillips was advised that interview was part of a criminal investigation) *with* R.Vol. 3 at 25 *and* R.Vol. 4 at 103 (Phillips was not so advised); R.Vol. 3 at 31 (Phillips asked Mobley about his refunding overpayments) *with* R.Vol. 4 at 97, 106 (Mobley asked Phillips if he would refund overpayments). Nevertheless we do not disturb the district judge's ruling that Phillips's statements to Mobley were admissible.

More or less as Phillips spoke to her, Mobley recorded his statements on a form which she expected him to sign. When he refused to sign it, she summarized the statements on another form and destroyed the original form without transcribing it verbatim. *See* R.Vol. 4 at 120–21.

Rules' limitations on lay opinion are designed to exclude.[5] Whether or not it was inadmissible, however, Agent Mobley's observation, by itself, is insufficient to support a finding that Phillips acted with fraudulent intent. Agent Mobley did not reveal what Phillips had said, or done, to convince her that he understood "the meaning of disability." She did not quote, paraphrase,[6] or even objectively summarize any statements that might have helped the jury decide whether Phillips knew that he was not entitled to the payments. Consequently, her testimony gave the jury no basis for making any independent judgment about Phillips's state of mind.[7] With only Agent Mobley's unsupported lay opinion before it, a reasonable jury would be left with some reasonable doubt, *see United States v. Buckley*, 586 F.2d 498, 504 (5th Cir. 1978), *quoting United States v. Stephenson*, 474 F.2d 1353, 1355 (5th Cir. 1973), that Phillips knew he was defrauding the government.

Oddly, the government also makes much of Agent Mobley's testimony that Phillips "stated that, you know, that they [the checks] were rightfully his since he had paid into the fund, you know, over such a long period of time." R.Vol. 4 at 108. *See also* R.Vol. 4 at 96. On its face, Phillips's assertion that he was entitled to the benefits is exculpatory; it tends to show that he did not think he was doing wrong. Indeed, the government's position is almost perverse; simply by saying that the checks were rightfully his, Phillips—claims the government—revealed that he thought the checks were *not* rightfully his. Of course, Phillips's statement may be evidence that he believed himself morally entitled to the benefits no matter what the law provided; that in turn may be evidence that Phillips ignored legal requirements in an effort to keep receiving the benefits. But this infer-

ence is attenuated, and scarcely unavoidable. Phillips may instead have been saying that since he had once worked, he did not consider his payments a handout and therefore had no qualms about accepting the money, which he thought the government willingly disbursed. He may have been suggesting that since he had no moral doubts about accepting the money, he was not alerted to the possible legal problems. *Cf. Screws v. United States*, 325 U.S. 91, 104–05, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) (plurality opinion) (defendant who intentionally deprives a person of clear constitutional right cannot claim lack of fair notice that his act was criminal (prosecution under 18 U.S.C. § 242)). Since the jury did not itself see and hear Phillips make the statement, and since Agent Mobley did not specify the context and the circumstances in which it was made, the jury would have had no basis whatever for placing the most inculpatory construction on Phillips's remark.

Of course, the government does not have to prove Phillips's intent from Phillips's statements alone. Two other avenues are open in a case like this. The government might argue that a jury can conclude, from its common sense knowledge, that every disability recipient who applies for benefits on his own initiative understands enough to know that if he returns to work his benefits will be reduced or terminated. If Phillips had returned to his previous job at the same wages and hours, this argument would be more persuasive. But after his illness Phillips worked irregularly. In some weeks he did earn almost as much as he had before he became ill, but this occurred infrequently. Phillips's supervisor at work testified that Phillips's illness impaired his ability to work and forced him to work fewer hours. In some weeks Phillips was wholly unable to work. His doctors treated him frequent-

---

**5.** Apparently for this reason, the trial judge held inadmissible portions of Agent Mobley's written report which contained comparably conclusory observations.

**6.** *See* footnote 4 *supra*.

**7.** For the same reason, Agent Mobley's statement, on cross-examination:

"All right, he, according—from what I can remember . . . of my conversation with Mr. Phillips, he was aware that he was not entitled to checks, all right?"

R.Vol. 4 at 107, was not enough to sustain the case against Phillips.

ly and at one point he had to be hospitalized again. He said he feared that at any time he might again become unable to work for long periods. Some might argue that in a more compassionate society, Phillips's condition would entitle him to disability benefits, and that Phillips's believing that ours is such a society does not make him a criminal. Whatever the merits of that view, the basic issue is the extent to which we can expect citizens to understand the internal logic of complex government programs. To some degree, of course, we must act on the assumption that they do understand and hold them responsible if they do not. But here we deal with a criminal prosecution; with a defendant who has a sixth-grade education; and with a case of disability that was at least somewhat ambiguous.

In any event, Agent Wolpert's testimony vanquishes any suggestion that Phillips was so healthy that he must have known he was ineligible for payments. Wolpert testified that even after being told how much work Phillips was doing he would still have advised Phillips to continue cashing the checks he received and not to return them. From this we must infer that Wolpert, a trained SSA employee, did not think that Phillips was clearly ineligible for disability benefits; and from that we must conclude that a reasonable jury would have had some reasonable doubt that Phillips knew he was not entitled to the benefits. *See United States v. Critzer*, 498 F.2d 1160, 1162 (4th Cir. 1974).

Finally, the government might have been able to establish Phillips's fraudulent intent if his behavior had been so devious, and so uncharacteristic of an innocent person, that the jury could infer that Phillips must have known he was doing wrong. *See, e. g., United States v. Callahan*, 588 F.2d 1078, 1080–81, 1083 (5th Cir. 1979) (alleged tax evader kept elaborate fictitious records); *United States v. Schafer*, 580 F.2d 774, 782 (5th Cir.), *cert. denied*, 439 U.S. 970, 99 S.Ct. 463, 58 L.Ed.2d 430 (1978) (alleged tax evader avoided keeping records, and concealed information from, and made false statements to, government agents). But Phillips devised no elaborate schemes; he

had no such craft. Agent Wolpert noted on his report that in their interview Phillips was very forthcoming, and in fact Phillips provided Wolpert with accurate information about his work. Agent Mobley also found Phillips cooperative, and she too was given truthful answers. The government has not suggested that Phllips ever made a false statement to the SSA, either verbally or in writing. He never attempted to mislead the SSA about who his employer was or how much he was working. Indeed on forms he filled out at the hospital where he was treated, Phillips disclosed the details about his employment. Phillips's actions betray no sign of an effort to cheat the government. Essentially, then, the government's case that Phillips knew he was doing wrong rests on his failure to answer the letters sent to him. For many purposes, of course, the government is entitled to assume that citizens will read mail sent to them and be aware of its contents. But in a criminal prosecution where the government must show fraudulent intent, those of us who are comfortable with the forms and documents and often unlovely prose of the bureaucracy must not rush to assume that everyone is equally at ease with them. When Phillips dealt in the medium to which he was plainly more accustomed—verbal, face-to-face communications with the government agents—he was indisputably honest. Possibly, he ignored the SSA's letters because he felt slightly overwhelmed by written papers, or because he simply did not understand quite what to do with them. The government, which of course had the burden of proof, did not show otherwise; certainly it did not show that his ignoring the letters was part of a crude effort to defraud.

Indeed Phillips may have been guilty of nothing worse than insisting that the government know its place. His best precedent may be the case of Miss Emily Grierson, the elderly, unhappy heroine of an early Faulkner story. Miss Emily was forgiven her taxes by an erstwhile mayor of the town of Jefferson named Colonel Sartoris. "Not that Miss Emily would have accepted

charity. Colonel Sartoris invented an involved tale to the effect that Miss Emily's father had loaned money to the town which the town, as a matter of business, preferred this way of repaying."

When the next generation, with its more modern ideas, became mayors and aldermen, this arrangement created some little dissatisfaction. On the first of the year they mailed her a tax notice. February came, and there was no reply. They wrote her a formal letter, asking her to call at the sheriff's office at her convenience. A week later the mayor wrote her himself, offering to call or to send his car for her, and received in reply a note on paper of an archaic shape, in a thin, flowing calligraphy in faded ink, to the effect that she no longer went out at all. The tax notice was also enclosed, without comment.

They called a special meeting of the Board of Aldermen. A deputation waited upon her, knocked at the door through which no visitor had passed since she ceased giving china-painting lessons eight or ten years earlier.  .  .

She did not ask them to sit. She just stood in the door and listened quietly until the spokesman came to a stumbling halt. Then they could hear the invisible watch ticking at the end of the gold chain.

Her voice was dry and cold. "I have no taxes in Jefferson. Colonel Sartoris explained it to me. Perhaps one of you can gain access to the city records and satisfy yourselves."

"But we have. We are the city authorities, Miss Emily. Didn't you get a notice from the sheriff, signed by him?"

"I received a paper, yes," Miss Emily said. "Perhaps he considers himself the sheriff  .  .  .  I have no taxes in Jefferson."

"But there is nothing on the books to show that, you see. We must go by the——"

"See Colonel Sartoris. I have no taxes in Jefferson."

"But, Miss Emily——"

"See Colonel Sartoris." (Colonel Sartoris had been dead almost ten years.) "I have no taxes in Jefferson. Tobe!" The [butler] appeared. "Show these gentlemen out." [8]

By comparison Mr. Phillips treated the SSA quite well. Whatever his civil liabilities, he is not a criminal and he should not have been convicted of a crime.

REVERSED.

---

8.  W. Faulkner, "A Rose for Emily," Collected Stories (1950) 120–21.