**UNITED STATES of America, Appellee,**

v.

**Theodore V. ANZALONE,**
**Defendant, Appellant.**

**No. 84–1628.**

United States Court of Appeals,
First Circuit.

Argued Feb. 5, 1985.

July 1, 1985.

Bailey Aldrich, Senior Circuit Judge, filed concurring opinion.

Nancy Gertner, Boston, Mass., with whom Harvey A. Silverglate, Judith H. Mizner, and Silverglate, Gertner, Baker & Fine, Boston, Mass., were on brief, for defendant, appellant.

Daniel I. Small, Asst. U.S. Atty., Boston, Mass., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before TORRUELLA and ALDRICH, Circuit Judges, and PETTINE,* Senior District Judge.

* Of the District of Rhode Island, sitting by designation.

TORRUELLA, Circuit Judge.

▮ In contrast to what is permitted under other legal systems,[1] the Constitution of the United States mandates that, before any person is held responsible for violation of the criminal laws of this country, the conduct for which he is held accountable be prohibited with sufficient specificity to forewarn of the proscription of said conduct. U.S. Const. amend. V ("No person shall ... be deprived of life, liberty, or property, without due process of law"); *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) ("[A] penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."); *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972) ("[L]aws [must] give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."); *Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939) ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes."); *Balthazar v. Superior Court of Mass.,* 573 F.2d 698 (1st Cir.1978). It is this principle that is at stake in the issues presented by this appeal.

The Currency Transaction Reporting Act ("Reporting Act"), 31 U.S.C. § 5311 *et seq.,* authorizes the Secretary of the Treasury to require domestic financial institutions, and any other participants in transactions for the payment, receipt or transfer of United States currency, to report said transactions to the Secretary.[2] The Secretary has issued regulations requiring only financial institutions to file these reports.[3] Pursuant to these regulations, as well as § 5322(b) of the Reporting Act,[4] financial institutions[5] must report transactions in

---

**1.** *Cf. Rex v. Manley,* [1933] 1 K.B. 529; *Shaw v. Director of Public Prosecution,* [1961] 2 All Eng.R. 446. Consider also the principle of "crimes by analogy," discussed in E.L. Johnson, *An Introduction to the Soviet Legal System,* 39–40 (1972) (quoting Article 16, Criminal Code of 1926, U.S.S.R.: "If any socially dangerous act has not been directly provided for by the present Code, the basis and extent of liability for it is determined by applying to it those articles of the Code which deal with the offences most similar in nature."). *See also Papachristou v. City of Jacksonville,* 405 U.S. 156, 168 n. 12, 92 S.Ct. 839, 846 n. 12, 31 L.Ed.2d 110 (1972).

**2.** 31 U.S.C. § 5313(a) states:

(a) When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes. A participant acting for another person shall make the report as the agent or bailee of the person and identify the person for whom the transaction is being made.

**3.** 31 C.F.R. 103.22 provides:

(a) Each financial institution shall file a report of each deposit, withdrawal, exchange

of currency or other payment or transfer, by, through, or to such financial institution, which involves a transaction in currency of more than $10,000. Such reports shall be made on forms prescribed by the Secretary and all information called for in the forms shall be furnished.

**4.** 31 U.S.C. § 5322 reads in its pertinent part:

(a) A person willfully violating this subchapter or a regulation presented under this subchapter (except section 5315 of this title or a regulation prescribed under section 5315) shall be fined not more than $1,000, imprisoned for not more than one year, or both.

(b) A person willfully violating this subchapter or a regulation prescribed under this subchapter (except section 5315 of this title or a regulation prescribed under section 5315), while violating another law of the United States or as part of a pattern of illegal activity involving transactions of more than $100,000 in a 12-month period, shall be fined not more than $500,000, imprisoned for not more than 5 years, or both.

**5.** The term "financial institution" is defined in 31 U.S.C. § 5312(a)(2) as:

(A) an insured bank (as defined in section 3(h) of the Federal Deposit Insurance Act (12 U.S.C. 1813(h)));

(B) a commercial bank or trust company;

. . . . .

(F) a thrift institution;

excess of $10,000,[6] and transactions totalling more than $100,000 in a 12-month period.

On November 13, 1980 appellant purchased three checks from the Haymarket Cooperative Bank ("Bank"), all of which totaled more than $25,000 but none of which exceeded $10,000 individually. Thereafter, on separate dates commencing November 18, 1980 and ending December 1, 1980, appellant purchased nine additional checks totalling $75,000, again none of which individually exceeded $10,000. All the checks were payable to the same stock brokerage firm to pay for bonds purchased to the account of the wife and mother of a public official. The Bank did not file any reports concerning any of those transactions.

The government, labelling these dealings a "structured" transaction, concluded they were part of the same event and thus came within the purview of the Reporting Act as involving transfers of currency in excess of $10,000 and $100,000, respectively. No charges were brought against the financial institution, however.

Instead, the government decided to test the limits of statutory interpretation by charging appellant with a panoply of criminal violations. The government brought a five-count indictment, only two of which counts survived the two juries that heard the evidence.[7] This appeal is thus concerned only with matters related to Counts III and V.

In Count III appellant was charged with violation of 18 U.S.C. § 1001 (which proscribes schemes to conceal, or to cause to be concealed, from the federal government a material fact),[8] and 18 U.S.C. § 2 (which proscribes aiding, abetting or causing a crime by another).[9] The essence of this charge is that appellant's failure to inform the Bank of the "structured" nature of his transfers constituted an illegal scheme to avoid detection of these payments by causing the Bank to fail in its duty to report them.

In 31 C.F.R. 103.11 this term is also defined:
*Financial institution.* Each agency, branch, or office within the United States of any person doing business in one or more of the capacities listed below:
(1) A bank (except bank credit card systems);

. . . . .

(4) A person who engages as a business in the issuing, selling, or redeeming of travelers' checks, money orders, or similar instruments, except one who does so as a selling agent exclusively or as an incidental part of another business;

6. In addition to what is provided for in 31 C.F.R. 103.22 (*see supra*, note 3), the currency transaction report (Form 4789) states:
Each financial institution must file a Form 4789 for each deposit, withdrawal, exchange of currency, or other payment or transfer, by, through, or to that financial institution, which involves a transaction in currency of more than $10,000. Multiple transactions by or for any person which in any one day total more than $10,000 should be treated as a single transaction, if the financial institution is aware of them.
This form is prepared by the Treasury Department for use by the financial institution. It is not a part of the Code of Federal Regulations and is thus not binding on financial institutions, although it is apparently complied with volun-

tarily. There is no evidence that persons other than financial institutions, such as appellant herein, are aware of the contents of this form.

7. Counts I and II, which alleged violations of the Hobbs Act, 18 U.S.C. § 1951, were severed and tried separately. Appellant was found not guilty by the jury. In the other trial the jury found appellant not guilty on Count IV and guilty on Counts III and V.

8. 18 U.S.C. § 1001 provides:
Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

9. 18 U.S.C. § 2 provides:
(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

Count V is based on the same underlying facts as Count III, but in addition to charging appellant with violation of 18 U.S.C. § 2 for having caused the Bank to fail to file the reports, it is also alleged that appellant violated the Reporting Act, 31 U.S.C. §§ 5313, 5322 (imposing penalties for failure to file reports under the Reporting Act) and its regulations, 31 C.F.R. 22.

Appellant challenged the application of these statutes and regulations through appropriate motions before the district court. He claimed unconstitutional vagueness and lack of due notice to him that his actions were proscribed by these provisions. The court, citing *United States v. Tobon-Builes*, 706 F.2d 1092 (11th Cir.1983), *United States v. Thompson*, 603 F.2d 1200 (5th Cir.1979), and *United States v. Konefal*, 566 F.Supp. 698 (N.D.N.Y.1983), ruled in effect that "structured" transactions were considered a single transaction within the requirements of the Reporting Act and regulations. It concluded that the application of criminal sanctions to appellant for engaging in the conduct described in the indictment did not run contrary to the fair warning elements of the due process clause. These matters are now raised on appeal.

We are required to determine whether the Reporting Act and its regulations gave appellant sufficient advance warning that, if he engaged in "structured" transactions exceeding the established amounts, he was obligated to disclose this to the Bank so that it would report the transaction to the Secretary of the Treasury. Otherwise stated, we must determine whether appellant had fair warning that his actions and nondisclosure subjected him to criminal sanctions under 18 U.S.C. §§ 2, 1001 and 31 U.S.C. §§ 5312, 5322.

Irrespective of how we phrase this issue, the answer is in the negative.

■ We start with the proposition, correlative to the one with which we commenced this opinion, that criminal laws are to be strictly construed. *United States v.*

*Enmons*, 410 U.S. 396, 411, 93 S.Ct. 1007, 1015, 35 L.Ed.2d 379 (1973) (Hobbs Act); *United States v. Campos-Serrano*, 404 U.S. 293, 297, 92 S.Ct. 471, 474, 30 L.Ed.2d 457 (1971) (Immigration and Naturalization Act); *United States v. Bass*, 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971) (Omnibus Crime Control and Safe Streets Act); *United States v. Boston & Me. R.R.*, 380 U.S. 157, 160, 85 S.Ct. 868, 870, 13 L.Ed.2d 728 (1965) (Clayton Act). In the later case, which arose from this circuit, the Court cited Chief Justice Marshall who said:

> The rule that penal laws are to be construed strictly, is, perhaps, not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principal that the power of punishment is vested in the legislative, not in the judicial department.[10]

More on point, the Court in *Boston & Me. R.R.* went on to say that "[t]he fact that a particular activity may be within the same general classification and policy of those covered does not necessarily bring it within the ambit of the criminal prohibition." *United States v. Boston & Me. R.R.*, 380 U.S. 157, 160, 85 S.Ct. 868, 870, 13 L.Ed.2d 728 (1965). *See also supra* note 1 (discussing "crimes by analogy").

The Court in *United States v. Bass, supra*, indicated the rationale of this rule, which, as stated, dovetails with the prior notice requirements of the fifth amendment:

> This principal is founded on two policies that have long been part of our tradition. First, "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear." Second, because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define crimi-

**10.** *United States v. Wiltberger*, 5 Wheat. 76, 95, 5 L.Ed. 37 (1820).

nal activity. This policy embodies "the distinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." Thus, where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant.

*United States v. Bass,* 404 U.S. 336, 348, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971) (citations and footnotes omitted).

The present ambiguity regarding coverage of the Reporting Act and its regulations has been created by the government itself. To begin with, the statute, 31 U.S.C. § 5313(a), extended its coverage to the financial institution and *any other participant in the transaction.* This means that the Secretary could have required not only the Bank to file a report, but also appellant, the stock brokerage firm, and even the beneficiaries of the transaction. But for reasons known only to the Treasury Department, the regulation enacted by the Secretary, 31 C.F.R. 103.22, limited the reporting requirement to the financial institution *only. See California Bankers Ass'n v. Shultz,* 416 U.S. 21, 58, 69–70 & n. 29, 94 S.Ct. 1494, 1516, 1521 & n. 29, 39 L.Ed.2d 812 (1974). This would indicate to any objective viewer that the Secretary was looking to the Bank, *not* to the "other participants in the transaction," as the source of the information required by the Reporting Act. Should such a regulation have alerted or put on notice "other participants in the transaction" that something was required of them vis-a-vis the filing of the report? We think not. Such a regulation, in the face of the self-imposed limitation made upon the original power granted

to the Secretary by § 5313(a), would at the least cause confusion in the minds of "other participants in the transaction," and even more likely lead them to conclude that they had been excluded from its affirmative duties.

We next come to the "structured" transaction issue. We can find nothing on the face of either the Reporting Act, or its regulations, or in their legislative history, to support the proposition that a "structured" transaction by a customer constitutes an illegal evasion of any reporting duty of that customer.[11]

We need not go far to sustain this contention. The government itself has admitted to so much, though concededly through a branch other than the Justice Department. We refer to a report to Congress by the Comptroller General of the United States entitled, "Bank Secrecy Act Reporting Requirements Have Not Yet Met Expectations, Suggesting Need for Amendment," GED–81–80, dated July 23, 1981.[12] The report discussed the deficiencies in the regulation on this issue, noting that "The regulations were silent on the propriety of a customer's conducting multiple transactions to avoid reporting." *Id.* at 23. Under the heading "Failure to prohibit splitting transactions allowed to circumvent reporting requirement," *id.* at 24, the report indicates:

> Similarly, although the regulation required reporting for each single transaction above $10,000, they did not specifically prohibit dividing a large transaction into several smaller transactions to circumvent the reporting requirement.…

**11.** The only definition of a transaction is contained in 31 C.F.R. § 103.11:

*Transaction in currency.* A transaction involving the physical transfer of currency from one person to another. A transaction which is a transfer of funds by means of bank check, bank draft, wire transfer, or other written order, and which does not include the physical transfer of currency is not a transaction in currency within the meaning of this part.

**12.** This same report was excluded at trial by virtue of a motion in limine filed by the government. Appellant had sought to introduce the

report as evidence of his state of mind, a matter to be determined by the trier of fact. We make use of this material here not for those purposes, but rather to determine a question of law, namely whether the statute was too ambiguous to give fair notice of its proscriptions. The report thus stands as any other writing used by the court to aid in its legal analysis. *See, e.g., Panama Canal Co. v. Grace Line, Inc.,* 356 U.S. 309, 319 & n. 3, 78 S.Ct. 752, 758 & n. 3, 2 L.Ed.2d 788 (1958) (referring to report of Comptroller General as evidence that federal statute was ambiguous).

Under the title "Revision of regulations was not given a high priority," *id.* at 25, the report went on to say:

Even though Treasury was aware of the flaws in the regulations in 1975, it did not publish, for comment, a proposal for needed revisions until September 1979; and Treasury did not implement revised regulations until July 7, 1980. Furthermore, despite the Secretary of the Treasury's commitment to a congressional committee in 1977 to revise the regulations, this was not done.

According to the report, although the July 1980 revisions to the regulations resolved some of the deficiencies, "the propriety of multiple transactions still has not been addressed in the regulations." *Id.* at 26.

■ Although this court, like all other institutions of the United States, is supportive of the law enforcement goals of the government and society, we cannot engage in unprincipled interpretation of the law, lest we foment lawlessness instead of compliance. *Kolender v. Lawson,* 461 U.S. 352, 361, 103 S.Ct. 1855, 1860, 75 L.Ed.2d 903 (1983). This is particularly so when the confusion and uncertainty in this law has been caused by the government itself, and when the solution to that situation, namely eliminating any perceived loop holes, lies completely within the government's control. If the government wishes to impose a duty on customers, or "other participants in the transaction," to report "structured" transactions, let it require so in plain language. It should not attempt to impose such a duty by implication, expecting that the courts will stretch statutory construction past the breaking point to accommodate the government's interpretation.[13]

■ We are required to conclude that the Reporting Act and its regulations, as they presently read, imposed *no duty* on appellant to inform the Bank of the "structured" nature of the transactions here in question. The application of criminal sanctions to appellant for engaging in the activities heretofore described violates the fair warning requirements of the due process clause of the fifth amendment. The charges under Count V should have been dismissed.

■ The charges under Count III, alleging violations of 18 U.S.C. § 2 and § 1001 must also fail because they depend upon the applicability of the Reporting Act, § 5313, to appellant. An examination of § 1001 reveals that it encompasses two distinct offenses: concealment of a material fact, and false representation of a material fact. *United States v. Diogo,* 320 F.2d 898, 902 (2d Cir.1963). Count III alleges the first offense, concealment of a material

---

13. We are reminded of Chief Justice Burger's opinion in *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 194–195, 98 S.Ct. 2279, 2301–2302, 57 L.Ed.2d 117 (1978):

Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process or interpreting a statute. Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end. We do not sit as a committee of review, nor are we vested with the power of veto. The lines ascribed to Sir Thomas More by Robert Bolt are not without relevance here:

'The law, Roper, the law. I know what's legal, not what's right. And I'll stick to what's legal.... I'm not God. The currents and eddies of right and wrong, which you find such plain-sailing, I can't navigate, I'm no voyager. But in the thickets of the law, oh there I'm a forester.... What would you do? Cut a great road through the law to get after the Devil? ... And when the last law was down, and the Devil turned round on you where would you hide, Roper, the laws all being flat? ... This country's planted thick with laws from coast to coast—Man's laws, not God's—and if you cut them down ... d'you really think you could stand upright in the winds that would blow then? ... Yes, I'd give the Devil benefit of law, for my own safety's sake.' R. Bolt, A Man for All Seasons, Act I, p. 147 (Three Plays, Heinemann ed. 1967).

We agree with the Court of Appeals that in our constitutional system the commitment to the separation of powers is too fundamental for us to pre-empt congressional action by judicially decreeing what accords with 'common sense and the public weal.' Our Constitution vests such responsibilities in the political branches.

*See also Weinberger v. Romero-Barceló,* 456 U.S. 305, 335 n. 20, 102 S.Ct. 1798, 1815 n. 20, 72 L.Ed.2d 91 (1982) (Stevens, J., dissenting).

fact. But in prosecuting a § 1001 concealment violation, it is incumbent upon the government to prove that the defendant had a *legal duty* to disclose the material facts at the time he was alleged to have concealed them. *United States v. Irwin,* 654 F.2d 671, 678–679 (10th Cir.1981), *cert. denied,* 455 U.S. 1016, 102 S.Ct. 1709, 72 L.Ed.2d 133 (1982). As no such duty existed on behalf of appellant to report to the Secretary either directly or through the financial institution, there can be no concealment in violation of 18 U.S.C. § 1001. *United States v. Muntain,* 610 F.2d 964, 971–972 (D.C.Cir.1979); *United States v. Ivey,* 322 F.2d 523, 524–526 (4th Cir.), *cert. denied,* 375 U.S. 953, 84 S.Ct. 444, 11 L.Ed.2d 313 (1963); *United States v. Phillips,* 600 F.2d 535, 536–537 (5th Cir.1979). The 18 U.S.C. § 2 allegations must also, therefore, fail since appellant did not aid, abet or cause anyone to commit an offense against the United States. The Bank, under the circumstances of this case, did not commit any crime by failing to report transactions as it lacked knowledge of their "structured" nature.

We are not unaware of a line of cases deciding otherwise and relied upon by the district court and the government on appeal. In *United States v. Thompson,* 603 F.2d 1200 (5th Cir.1979), the chairman of the board of a bank, in order to finance a drug operation, divided a $45,000 cash transaction to his accomplice into five separate $9,000 bundles to avoid filing a report under the Reporting Act. The Court of Appeals sustained his conviction under said statute in the face of a vagueness challenge. It would appear that Thompson's position with the bank, and the teller's reliance on his authority in not filing the report, partially explain the case's outcome. Certainly Thompson owed the bank a fiduciary and legal *duty* to disclose the nature of this transaction, a situation which is not duplicated in the present case.

Nonetheless, we still find troubling the court's ruling that a "structured" transaction is illegal evasion of the Reporting Act, and not avoidance. This view, which has elsewhere been labeled the "sensible, substance-over-form approach," [14] has been followed by several other courts. *See United States v. Cook, supra; United States v. Tobon-Builes, supra; United States v. Puerto,* 730 F.2d 627 (11th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 162, 83 L.Ed.2d 98 (1984); *United States v. Sánchez-Vázquez,* 585 F.Supp. 990 (N.D.Ga. 1984); *United States v. Konefal,* 566 F.Supp. 698 (N.D.N.Y.1983). We can only say that, as applied to the present situation, we disagree for the reasons stated herein.[15] Between a "sensible" and a constitutional approach there should be no doubt as to which avenue we must choose. *See Tennessee Valley Authority v. Hill, supra,* 437 U.S. at 195, 98 S.Ct. at 2302.

The appellant's conviction is reversed and the indictment dismissed.

BAILEY ALDRICH, Senior Circuit Judge, concurring.

It is difficult to disagree with the court's strong opinion, and I have only one reservation. It is certainly true that defendant, as to whom no reporting rule or regulation whatever is directed, faces jail while the bank, which, in my opinion, *post,* was in clear violation, faces nothing, and true that the government has gone to the "limits of statutory interpretation" at defendant's expense. I must also agree that this differentiation in prosecution is not our affair. However, I wish to comment further upon the factual, as well as the statutory, limits to which the government would have the court go.

If, for the moment, we forget November 13—the government, until recently, forgot the significance of it altogether—on vari-

---

**14.** *See United States v. Cook,* 745 F.2d 1311, 1315 (10th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1205, 84 L.Ed.2d 347 (1985); *United States v. Tobon-Builes,* 706 F.2d 1092, 1098 (11th Cir.), *reh. denied,* 716 F.2d 914 (11th Cir.1983).

**15.** For a more closely analogous situation, *see United States v. San Juan,* 405 F.Supp. 686, 692–93 (D.Vt.1975), *rev'd on other grounds,* 545 F.2d 314 (2d Cir.1976).

ous days in November, 1980, defendant purchased a single cashier's check for less than $10,000, from the Haymarket Cooperative Bank, all for one client, for whom he was purchasing securities from a New York broker. The check transactions, being for less than $10,000, were not individually reportable. The government, on these facts, would have it that defendant must go to jail because he did not bring all the money in at once and acquire a single check. It paints with a broad brush. In its summation it told the jury,

> "So the scheme becomes moving large amounts of cash through banks to make it appear legitimate.... In late 1980, the Bear Stearns money, $100,000.... [I]f this is all right, then the reporting requirement is meaningless. If you can simply create 12 phony transactions out of one larger sum of cash and avoid the currency reporting requirement, what's left of the law? ... That is not the law. The law is that structuring is not okay.... With the $100,000, the first scheme, the web is obvious."

Apparently government counsel's so stating the law to the jury was with the court's approval; it did not correct or change it.

There is nothing in the statute or regulations specifically requiring a customer to make reports, or to handle his money in any particular fashion; the only reporting duty is on the bank. I find it singular to think that the government should be able to impose duties by indirection, or to say that the customer must conduct himself so as to create such a duty, unless, possibly, in very special circumstances. *C.f. United States v. Thompson,* 603 F.2d 1200 (5th Cir.1979). "If you purchase a $8,500 check on Monday and another on Tuesday, it is jail for you for not buying them both on Monday if your intent was that the bank should not have to report." That may be an "obvious web" to the government. It is anything but to me.

November 13, however, was different. On that one day defendant acquired three $8,500 checks from the Haymarket Bank; one from its East Boston branch and two from different tellers in its Hanover Street branch. Even without knowing of the reporting form requirement (I do not agree with the court that the Secretary was unauthorized to issue instructions on the form, though I do agree that defendant was not on notice thereof) a customer knowing, as defendant did, that the bank had a $10,000 reporting obligation, might reasonably think that splitting $17,000 between two tellers, if not $25,000 between two branches, was finagling, with the improper hope that the bank would fail to notice its duty. It is a different matter to attempt to conceal (18 U.S.C. § 1001, opinion, *ante,* n. 8) when the bank had a duty, as distinguished from avoiding creating one. To say simply, as the court does, that defendant had no duty not to conceal, seems perhaps too easy an answer. The court's statement that the bank "did not commit any crime by failing to report transactions as it lacked knowledge of their 'structured nature,'" applies rightly to the alleged $100,000 "scheme," but I believe it assumes the point here, rather than answers it. Here, strictly, the bank did have "knowledge," and a duty. Defendant could be found to have acted in an artificial manner in order that, through hoped-for inadvertence, the bank would fail to perform it.

The government, however, having improperly obtained a conviction on a more appealing (had it been correct) $100,000, "twelve phony checks" basis, one trial seems enough, and, as a minority judge, I am content not to pursue whether defendant's single November 13th conduct was punishable.