780 F.2d 758
 89 A.L.R.Fed. 759, 57 A.F.T.R.2d 86-829,
54 USLW 2396,
86-1 USTC P 9203
 UNITED STATES of America, Plaintiff-Appellee,
v.
Duane N. VARBEL, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Roy OSBORN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Larren SCHMIDT, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert John BRYAN, Defendant-Appellant.
 Nos. 84-1231, 84-1248, 84-1250 and 84-1251.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 6, 1985.
Decided Jan. 10, 1986.
 
 Susan A. Ehrlich, Asst. U.S. Atty., Phoenix, Ariz., for the U.S.
 Gary L. Thomas, Phoenix, Ariz., for Varbel.
 James Hamilton Kemper, Emmet Ronan, Phoenix, Ariz., for Osborn.
 William A. Cohan, Denver, Colo., for Schmidt.
 Donald W. MacPherson, MacPherson, McCarville, P.A., Joseph Rocco, Phoenix, Ariz., for Bryan.
 Appeal from the United States District Court for the District of Arizona.
 Before ANDERSON, BEEZER, and BRUNETTI, Circuit Judges.
 BEEZER, Circuit Judge:
 
 
 1
 The conversion of cash into funds that may be exchanged easily without a trace of their origin is a recognized problem for law enforcement officials. Money laundering is common among narcotics traffickers, tax evaders and organized crime figures. The substantive crimes alleged in the indictment at issue involve the concept of "money laundering."
 
 
 2
 Appellants were convicted of wire fraud, conspiracy to conceal and concealing material facts within the jurisdiction of the Internal Revenue Service. They contend that the indictment failed to allege a crime under 31 U.S.C. Secs. 5313 and 5322. We agree and reverse their convictions.
 
 
 3
 * Facts
 
 
 4
 In 1982, the FBI received information that Duane Varbel, a Phoenix attorney, was allegedly engaged in "money laundering." As part of its investigation, the FBI implemented a "sting" operation. Rex Reynolds, a government informant, and Julian Miller, an undercover FBI agent, posed as cocaine dealers interested in laundering narcotics proceeds. Reynolds contacted Varbel and sought his advice.
 
 
 5
 Reynolds and Varbel met on August 12, 1982.[1] Varbel discussed off-shore banks, Cayman Islands secrecy laws and United States currency laws. He advised Reynolds not to take more than $5,000 in currency out of the United States because Reynolds would have to report it. Varbel suggested that Reynolds form a Caymanian corporation.
 
 
 6
 On September 4, Reynolds and Miller went to Varbel's office with a bag of cash. Varbel agreed to go with Reynolds to the Cayman Islands to set up a corporation. Varbel later informed Reynolds that he was unable to go and recommended that Roy Osborn take his place. Osborn was an attorney with whom Varbel shared an office.
 
 
 7
 On September 23, Osborn flew to Grand Cayman to incorporate Reynolds's company. He was referred to Mitchell Exctain of U.S. Tax Planning Services Ltd. (USTP). Exctain recommended that Osborn contact Jack Bryan at the USTP office in Irvine, California. Upon his return, Osborn wrote to Exctain and confirmed that Reynolds wanted to form Anderex, an offshore investment company. An incorporation fee of $4,000 was paid and $800 was deposited in the Anderex account, which had been established at the Intercontinental Bank in the Cayman Islands. In October, another $4,700 was transferred through USTP to the Anderex account. Osborn gave Miller the account number and Bryan's address and telephone number in Irvine.
 
 
 8
 On November 1, Miller met with Bryan and Larry Schmidt of USTP. Miller gave them $50,000 cash to deposit in the Anderex account. Bryan stated that he would go to different banks around Irvine the next day and obtain cashier's checks in amounts less than $10,000 but totalling $50,000. The checks would be transferred to the Anderex account. Bryan explained that the banks would not file a report for amounts less than $10,000. Once the $50,000 was deposited in the Anderex account, it would be returned to Reynolds as a bank loan.
 
 
 9
 Between November 2 and 4, six cashier's checks were purchased and made payable to Anderex. On November 2, three cashier's checks were purchased: one for $9,620 at the Orange City Bank by Myron Larson, another for $9,000 at the Home Bank by Jim Swanson, and the third for $9,350 at California First Bank by Dennis Whire. On November 3, a cashier's check for $9,100 was purchased at San Diego Trust and Savings Bank by Mark Johnson. Two more cashier's checks were obtained the following day; one for $6,750 at Union Federal Savings by Steven Andersen, the other for $6,180 at Union Bank by Bob Miller. The names given by the purchasers were false. Bryan bought five of the checks and Schmidt purchased one. None of the banks filed reports concerning any of the transactions.
 
 
 10
 In November, Bryan told Reynolds that he could "funnel a lot of money" out of the country. He explained that the First International Bank and Trust located in the USTP Caymanian office made "loans" to its clients. The loan papers and promissory note were being drafted and the money would be wired to Reynolds's Phoenix bank account.
 
 
 11
 On November 16, Miller called Bryan and gave him the Phoenix account number. Miller stated that Reynolds wanted $54,000 deposited to the account. Bryan responded that the money would be there in 24-72 hours, and that the loan papers from Anderex were on the way. The money was wired to the Phoenix account by order of Bank Intercontinental on November 23.
 
 
 12
 On December 15, Schmidt purchased a $2,500 cashier's check in a false name made payable to Anderex. $2,500 was soon wired from Bank Intercontinental to the Phoenix account.
 
 
 13
 Appellants were indicted on July 28, 1983. They were tried for conspiracy to conceal and for concealing material facts in a matter within the jurisdiction of the Internal Revenue Service (IRS) in violation of 18 U.S.C. Sec. 371 (Count I) and 18 U.S.C. Secs. 1001[2] and 2[3] (Count II), and for two counts of wire fraud in violation of 18 U.S.C. Secs. 1343[4] and 2 (Counts III and IV). The material facts allegedly concealed were the existence, source, and transfer of cash from the United States to the Cayman Islands without currency transaction reports being filed by the banks as required by 31 U.S.C. Sec. 5313 and the return of the money to the United States as non-traceable loans.
 
 
 14
 The jury found Varbel, Osborn and Bryan guilty on each count. Schmidt was found not guilty on Count III and guilty on the remaining counts. The appellants timely appeal.
 
 
 15
 This case presents an issue of first impression in this circuit. We are required to determine whether the Currency Transaction Reporting Act and regulations promulgated pursuant to the Act imposed a duty on appellants to inform the banks of the nature of their currency transactions. We hold they do not.
 
 II
 Analysis
 
 16
 It is well settled that criminal laws are to be strictly construed. United States v. Enmons, 410 U.S. 396, 411, 93 S.Ct. 1007, 1015, 35 L.Ed.2d 379 (1973) (Hobbs Act); United States v. Campos-Serrano, 404 U.S. 293, 297, 92 S.Ct. 471, 474, 30 L.Ed.2d 457 (1971), cert. denied, 404 U.S. 1023, 92 S.Ct. 686, 30 L.Ed.2d 673 (1972) (Immigration and Naturalization Act); United States v. Bass, 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971) (Omnibus Crime Control and Safe Streets Act); United States v. Dangdee, 616 F.2d 1118, 1119 (9th Cir.1980). "[A] penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983).
 
 
 17
 It is also well settled that conduct made punishable by the government must be the subject of a valid criminal statute which existed at the time of the alleged offense. Bouie v. City of Columbia, 378 U.S. 347, 353-54, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894 (1964). We have held that a defendant could not be convicted of transporting forged securities when the transported instruments were not classified as securities in the criminal statute under which the indictment issued. United States v. Desmond, 419 F.2d 1286, 1287 (9th Cir.1969). See also, United States v. Gavrilovic, 551 F.2d 1099 (8th Cir.1977) (no one can be punished except according to law; mecolqualone not classified as a controlled substance at the time of the alleged offense).
 
 
 18
 The Currency Transaction Reporting Act ("Reporting Act"), 31 U.S.C. Sec. 5313,[5] authorizes the Secretary of the Treasury to require domestic financial institutions, and any other participants in specified currency transactions, to report those transactions to the Secretary. The Secretary's implementing regulations[6] require only financial institutions[7] to file currency transaction reports and then, only when they participate in currency transactions involving more than $10,000. The interpretation of these statutes and regulations raises a question of law which we review de novo. See United States v. Launder, 743 F.2d 686, 688-89 (9th Cir.1984). We also review the sufficiency of an indictment de novo. United States v. Buckley, 689 F.2d 893, 897 (9th Cir.1982), cert. denied, 460 U.S. 1086, 103 S.Ct. 1778, 76 L.Ed.2d 349 (1983).
 
 
 19
 We begin our interpretation by reading the statutes and regulations for their plain meaning. The plain meaning rule has its origin in United States v. Missouri Pac. R.R., 278 U.S. 269, 49 S.Ct. 133, 73 L.Ed. 322 (1929). There the Supreme Court stated that "where the language of an enactment is clear and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended." Id. at 278, 49 S.Ct. at 136. The principle was more recently affirmed in Dickerson v. New Banner Institute, Inc., 460 U.S. 103, 103 S.Ct. 986, 74 L.Ed.2d 845 (1983), reh'g denied, 461 U.S. 911, 103 S.Ct. 1887, 76 L.Ed.2d 815 (1983), where the Court stated, "[I]n determining the scope of a statute, one is to look first at its language. If the language is unambiguous, ... it is to be regarded as conclusive unless there is a clearly expressed legislative intent to the contrary." Id. at 110, 103 S.Ct. at 990 (citations and interior quotation marks omitted). In federal courts, the most common effect of the rule has been to preclude resort to legislative history, such as reports, hearings, and debates. A. Murphy, Old Maxims Never Die: The "Plain Meaning Rule and Statutory Interpretation in the 'Modern' Federal Court," 75 Colum.L.Rev. 1299, 1299-1300 (1975)
 
 
 20
 It is patently clear from the language of 31 U.S.C. Sec. 5313(a) that a currency transaction report is not required to be filed with the Secretary when the amount of the currency transaction is less than $10,000. The language of 31 C.F.R. Sec. 103.22 is equally plain--only financial institutions are required to file reports. Therefore, it is unnecessary for us to look to the legislative history in order to apply the regulation to situations other than those specified in the regulatory statute.
 
 
 21
 The First Circuit was recently presented with a case quite similar to the one at bar. In United States v. Anzalone, 766 F.2d 676 (1st Cir.1985), the defendant purchased three cashier's checks from the same bank in one day. The checks totalled more than $25,000, but none exceeded $10,000 individually. On separate dates, Anzalone purchased nine additional checks totalling $75,000, again none of which individually exceeded $10,000. The bank did not file any reports concerning the transactions.
 
 
 22
 Anzalone was charged with violation of 18 U.S.C. Secs. 1001 and 2, and 31 U.S.C. Secs. 5313 and 5322. The essence of the charges was that Anzalone's failure to inform the bank of the "structured" nature of his transfers constituted an illegal scheme to avoid detection of these payments by causing the bank to fail in its duty to report them. United States v. Anzalone, 766 F.2d at 680.
 
 
 23
 The First Circuit held that the Reporting Act and its attendant regulations imposed no duty on Anzalone to inform the bank of the structured nature of his currency transactions. The court found that the application of criminal sanctions for engaging in the described activities would violate the fair warning requirements of the due process clause of the fifth amendment. Id. at 682. The indictment was accordingly dismissed.
 
 
 24
 We find the First Circuit's reasoning persuasive. The present ambiguity regarding coverage of the Reporting Act and its regulations has indeed been created by the government itself. 31 U.S.C. Sec. 5313(a) extends its coverage to financial institutions and any other participant in the transaction. The Secretary could have required participants other than financial institutions to file a report; however, 31 C.F.R. Sec. 103.22 limits the reporting requirement to financial institutions only. See California Bankers Ass'n v. Shultz, 416 U.S. 21, 58, 69-70 & n. 29, 94 S.Ct. 1494, 1516, 1521 & n. 29, 39 L.Ed.2d 812 (1974).
 
 
 25
 We agree with the First Circuit that 31 C.F.R. Sec. 103.22, in the face of the self-imposed limitation made upon the original power granted by 31 U.S.C. Sec. 5313(a) to the Secretary, would cause confusion in the minds of "other participants in the transaction," and could also lead them to conclude that "they had been excluded from its affirmative duties." United States v. Anzalone, 766 F.2d at 681.
 
 
 26
 We conclude that the Reporting Act and its regulations did not impose a duty on appellants to inform the banks involved of the nature of their currency transaction. We believe that the application of criminal sanctions against appellants here would violate due process.
 
 
 27
 The indictment, which alleged violations of 18 U.S.C. Secs. 1001, 2, and 1343 must fail. Since appellants were under no duty to report their currency transactions to or through the bank, there can be no concealment in violation of 18 U.S.C. Sec. 1001. Nor did appellants violate 18 U.S.C. Sec. 2, since they did not aid, abet, or cause anyone to commit an offense against the United States. The banks here committed no crime by failing to report the subject currency transactions, since there is no evidence in the record that the banks had any knowledge of the manner in which the cashier's checks were purchased. Counts III and IV, alleging two violations of 18 U.S.C. Sec. 1343, must also be dismissed. Since the appellants have not illegally concealed matter within the jurisdiction of the IRS, the wire transfer of funds from the Cayman Islands to Phoenix could not have furthered a scheme to defraud the IRS.
 
 
 28
 Even though money laundering furthers the goals of those who may be engaged in criminal activity, it is not our function to rewrite the law or the implementing currency reporting regulations promulgated by the Secretary. If Congress or the Secretary wish to impose a reporting duty on financial institution customers, they must do so in clear, unambiguous language. We cannot impose the duty by implication.
 
 
 29
 The government and the district court have relied upon a number of cases which have held to the contrary. In United States v. Thompson, 603 F.2d 1200 (5th Cir.1979), a bank chairman of the board structured a $45,000 currency transaction into five $9,000 transaction to avoid filing a report. His conviction was sustained on appeal. The court noted that Thompson was a bank official and the commercial teller relied on his authority in not filing the report. 603 F.2d at 1201. While Thompson was a bank officer who breached the reporting duties imposed upon him by reason of his employment, the defendants in our case were not bound by any such duty.
 
 
 30
 We are aware of the other courts which have held that "structured" currency transactions similar to the activities at issue constitute an illegal evasion of the Reporting Act.[8] As applied to the situation before us, however, we must disagree for the reasons stated.
 
 
 31
 Our disposition makes it unnecessary for us to address the merits of the other issues raised on appeal.
 
 
 32
 The conviction of each of the defendants is REVERSED.
 
 
 
 [1]
 Most meetings between Reynolds, FBI undercover agents, and the defendants were recorded on tape or videotape
 
 
 [2]
 18 U.S.C. Sec. 1001 provides: "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."
 
 
 [3]
 18 U.S.C. Sec. 2 states: "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal. (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."
 
 
 [4]
 18 U.S.C. Sec. 1343 reads: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both."
 
 
 [5]
 31 U.S.C. Sec. 5313(a) provides:
 "(a) When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution, and any other participant in the transaction, the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes. A participant acting for another person shall make the report as the agent or bailee of the person and identify the person for whom the transaction is being made." (Emphasis added).
 
 
 [6]
 31 C.F.R. Sec. 103.22(a) (1984) states:
 "Each financial institution shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution, which involves a transaction in currency of more than $10,000."
 
 
 [7]
 31 U.S.C. Sec. 5312(a)(2) defines a "financial institution" as
 (A) an insured bank (as defined in section 3(h) of the Federal Deposit Insurance Act (12 U.S.C. Sec. 1813(h));
 (B) a commercial bank or trust company;
 * * *
 (F) a thrift institution.
 
 
 [8]
 See United States v. Cook, 745 F.2d 1311, 1315 (10th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1205, 84 L.Ed.2d 347 (1985); United States v. Puerto, 730 F.2d 627 (11th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 162, 83 L.Ed.2d 98 (1984); United States v. Tobon-Builes, 706 F.2d 1092, 1098 (11th Cir.), reh. denied, 716 F.2d 914 (11th Cir.1983); United States v. Sanchez Vasquez, 585 F.Supp. 990 (N.D.Ga.1984)