UNITED STATES of America

v.

SHEARSON LEHMAN BROTHERS, INC., et al.

Crim. Nos. 86–00293–01 to 86–00293–08.

United States District Court,
E.D. Pennsylvania,
Criminal Division.

Dec. 4, 1986.

---

**6.** *See* note 2, *supra,* and accompanying text.

**7.** *See* notes 1–3, *supra,* and accompanying text.

Glenn Bronson and Eric Kraeutler, Asst. U.S. Attys., U.S. Atty's Office, Philadelphia, Pa., for plaintiff.

C. Clark Hodgson, Jr., Philadelphia, Pa., for defendants.

## MEMORANDUM

SCIRICA, District Judge.

This is a matter of first impression in this circuit, requiring an examination of the statutory framework under which the United States has charged defendants with criminal liability for a sophisticated scheme to conceal from the government unreported and illegal income.

Defendants' liability is based on the Bank Secrecy Act of 1971 and its implementing regulations, which require financial institutions to file a report for any currency transaction exceeding $10,000. 31 U.S.C. § 5313; 31 C.F.R. § 103.22 (1985). Congress enacted these provisions to obtain records of large currency transactions as part of an effort to enforce criminal and tax laws. See California Bankers Ass'n v. Schultz, 416 U.S. 21, 26, 94 S.Ct. 1494, 1500, 39 L.Ed.2d 812 (1974).

The indictment alleges that defendants intentionally "structured" their currency transactions so that each transaction fell just short of the $10,000 reporting limit. As a result, defendants were able to conceal a large currency transaction from the government by splitting the amount into several smaller sums below $10,000. By implementing an elaborate plan to systematically avoid the reporting requirements, defendants were able to convert at least one million dollars of illegal gambling profits or other unreported cash into untraceable legal income.

Although defendants' money laundering is not illegal on its face, see United States v. Dela Espriella, 781 F.2d 1432, 1436 (9th Cir.1986) (money laundering itself is not a crime),[1] the indictment charges other crimes. Specifically, defendants are charged with violating: (1) 18 U.S.C. § 371 (conspiracy to defraud the United States through a scheme to violate currency reporting requirements); (2) 31 U.S.C. §§ 5313, 5322[2] and 18 U.S.C. § 2 (knowingly and willfully causing banks and defendant Shearson Lehman Brothers to fail to file Currency Transaction Reports (CTRs)); (3) 18 U.S.C. § 1001 and 18 U.S.C. § 2 (knowingly and willfully concealing, or causing to be concealed, material facts within the jurisdiction of the United States); and (4) 18 U.S.C. §§ 1952, 1955 (conducting an illegal gambling business

---

1. In 1986, Congress enacted legislation making money laundering a crime. See H.R. 5484, Pub.L. 99–570 (1986), which was signed by the President on October 27, 1986. Titled the "Anti-Drug Abuse Act of 1986," the statute includes subtitle H, which is labelled: "The Money Laundering Control Act of 1986." The money laundering provision imposes criminal penalties for individuals who knowingly use proceeds from unlawful activity to conduct a financial transaction to: (1) conceal the nature or ownership of the proceeds; or (2) avoid transaction reporting requirements. Id. This statute was enacted af-

ter the conduct in this case, and therefore does not apply.

2. 31 U.S.C. § 5322(b) imposes felony liability for violations of the Act that occur while violating another law, or as part of a pattern of illegal activity involving transactions of more than $100,000 in a 12–month period. Id. This section is referred to as the Act's "felony enhancement provision." See United States v. Konefal, 566 F.Supp. 698, 702 (N.D.N.Y.1983).

and using interstate telephone service in aid of that gambling enterprise).[3]

Defendants' various motions to dismiss focus primarily on the requirements for criminal liability from causing financial institutions to fail to file the necessary CTRs. Defendants allege that although the statutory scheme may require financial institutions to file CTRs, it fails to charge a crime against Shearson and the individual defendants for structuring their transactions to avoid triggering the CTR filing requirement. They also claim that even if the statutory scheme makes structuring a crime, it is unconstitutional because the statutes fail to give sufficient notice that structuring is unlawful.

In considering defendants' motions, I have accepted as true the factual allegations set forth in the indictment. *See Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 332 n. 16, 96 L.Ed. 367 (1952); *United States v. Bloom*, 78 F.R.D. 591, 597–98 (E.D.Pa.

1977). Based on these facts, I hold that although structuring a financial transaction is not unlawful per se, this scheme becomes criminal when used to intentionally cause a financial institution to fail to fulfill its legal duty to file a CTR for transactions totalling more than $10,000. Although banks had no duty to file a CTR at the time defendants presented the structured transactions, the initial act of intentionally breaking up the transactions into sums below $10,000 prevented the banks from fulfilling their statutory duty. This activity, which would have been a crime if committed by the banks, gives rise to defendants' criminal liability when viewed in the context of 18 U.S.C. § 2(b). *See United States v. Gimbel*, 632 F.Supp. 748, 753–55 (E.D.Wis.1985); *United States v. Richter*, 610 F.Supp. 480, 489–90 (N.D.Ill.1985), *aff'd sub nom. United States v. Mangovski*, 785 F.2d 312 (7th Cir.) and *United States v. Konstantinov*, 793 F.2d 1296 (7th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct.

---

**3.** Not all defendants are charged under each count in the indictment. The indictment sets forth the following charges:

Count 1—18 U.S.C. § 371 (conspiracy to defraud by concealing gambling income). All defendants except Mario Scinicariello.

Count 2—18 U.S.C. § 371 (conspiracy to defraud by concealing Scinicariello's unreported cash income). Defendants Shearson Lehman Brothers, Inc., Herbert L. Cantley, and Mario Scinicariello.

Count 3—18 U.S.C. §§ 1955 & 2 (operating an illegal gambling business). Defendants Cantley, Joseph Vito Mastronardo, Jr., Joseph Vito Mastronardo, Sr., John Vito Mastronardo, John Hector, and Mario Scinicariello.

Counts 4–24—18 U.S.C. §§ 1952 & 2 (use of interstate telephone service in aid of gambling business). Defendants Mastronardo, Jr., Mastronardo, Sr., John Vito Mastronardo and Hector.

Counts 25–37—31 U.S.C. §§ 5313, 5322 & 18 U.S.C. § 2 (causing banks to fail to file CTRs). Defendants Shearson, Cantley, Mastronardo, Jr., Mastronardo, Sr., John Vito Mastronardo and Hector.

Count 38—31 U.S.C. §§ 5313, 5322 & 18 U.S.C. § 2 (causing banks to fail to file CTRs). Defendant Sheldon Shore and all defendants in Counts 25–37.

Count 39—Same defendants and same charges as Counts 25–37.

Counts 40–45—31 U.S.C. §§ 5313, 5322 & 18 U.S.C. § 2 (causing banks to fail to file CTRs).

Defendants Shearson, Cantley and Scinicariello.

Counts 46–47—31 U.S.C. §§ 5313, 5322 & 18 U.S.C. § 2 (causing banks to fail to file CTRs). Defendants Shearson and Cantley.

Counts 48–54—31 U.S.C. §§ 5313, 5322 & 18 U.S.C. § 2 (failing to file and cause Shearson to fail to file CTRs relating to a transaction involving money from illegal gambling enterprise). All defendants except Shore and Scinicariello.

Count 55—Same charges as Counts 48–54. All defendants except Scinicariello.

Counts 56–59—31 U.S.C. §§ 5313, 5322 and 18 U.S.C. § 2 (failing to file and causing Shearson to fail to file CTRs relating to the account of Scinicariello). Defendants Shearson, Cantley and Scinicariello.

Count 60—31 U.S.C. §§ 5313, 5322 & 18 U.S.C. § 2 (failing to file and causing Shearson to fail to file CTRs relating to money from the account of Stanley Marvel, III).

Count 61—18 U.S.C. §§ 1001 & 2 (scheme to conceal material facts relating to money from Mastronardo gambling business). All defendants except Scinicariello.

Count 62—18 U.S.C. §§ 1001 & 2 (scheme to conceal material facts relating to Scinicariello account). Defendants Shearson, Cantley and Scinicariello.

Count 63—18 U.S.C. §§ 1001 & 2 (scheme to conceal material facts relating to the account of Stanley Marvel, III). Defendants Shearson and Cantley.

191, 93 L.Ed.2d 124 (1986); *United States v. Anzalone,* 766 F.2d 676, 683 (1st Cir.1985) (Aldrich, J., concurring). *See also United States v. Heyman,* 794 F.2d 788, 790–92 (2d Cir.1986). Therefore, for the following reasons, I deny defendants motion to dismiss the structuring counts and all other counts of the indictment.

### I. *Facts*

The indictment charges defendants Herbert Cantley, Joseph Mastronardo, Jr., Joseph Mastronardo, Sr., John Mastronardo, John Hector and Mario Scinicariello with conducting an illegal bookmaking operation in Pennsylvania, Florida, New York, and Alabama. Through Shearson Lehman Brothers, Inc. and Cantley, a sales manager at Shearson, these defendants undertook to convert the profits from their gambling business into bearer municipal bonds. These bonds are payable to the person having possession (the bearer) and require no endorsement or registration by the purchaser. More importantly, bearer bonds are tax free instruments and generate no government-required reports. Several defendants set up Shearson accounts in the names of other persons (nominee accounts) so that they could purchase the bonds without linking the transaction to their gambling operation.

Even with this elaborate system, defendants needed a device to avoid triggering CTR filings whenever they sought to transform at least $10,000 in currency into bearer bonds. *See* 31 U.S.C. §§ 5313, 5322; 31 C.F.R. § 103.22. As a result, defendants added another level of deception to their venture. Defendants split their currency into sums less than $10,000 (usually $9,900) and on the same day purchased cashier's checks, treasurer's checks, or money orders payable to Shearson from different tellers or different branches of the same bank. For example, by structuring a $19,800 transaction into two transactions under $10,000 (*e.g.,* $9,900 and $9,900), defendants could successfully avoid triggering a banks duty to file a CTR. In other instances, gambling proceeds were paid directly to Cantley, in his role as a Shearson employee. He and his sales assistant then followed a similar pattern by converting the cash into checks and money orders structured to avoid the $10,000 CTR requirement.[4]

Moreover, the indictment charges Shearson and Cantley with carrying out an identical scheme to conceal unreported income for defendant Scinicariello and Stanley Marvel, III, an unindicted co-conspirator.

### II. *Does the Indictment Charge a Crime?*

Based on several recent decisions in other circuits, *see, e.g., United States v. Larson,* 796 F.2d 244 (8th Cir.1986); *United States v. Reinis,* 794 F.2d 506 (9th Cir. 1986); *United States v. Anzalone,* 766 F.2d 676 (1st Cir.1985), defendants allege that structuring their transactions to avoid triggering a CTR filing fails to constitute a crime. Defendants contend the law requires banks to file CTRs only for transactions in excess of $10,000. By steering clear of those situations (*i.e.,* structuring all currency transactions to total less than $10,000), defendants maintain that they

---

**4.** Defendant Shearson alleges that Counts 48–60, which address the cash transactions with Shearson, and Counts 25–47, which address cash transactions at various commercial banks, are multiplicious. I disagree. In Counts 25–47, Shearson and the individual defendants are charged with causing commercial banks to fail to file. In Counts 48–60 however, Shearson is charged as a financial institution with failing to file a CTR upon the receipt of at least $10,000 in currency. The individual defendants in Counts 48–60 are charged under 18 U.S.C. § 2 with causing Shearson to fail to file or aiding and abetting Shearson in its failure to file.

The government has stated that along with Cantley, Shearson was indicted because of the conduct of several other unindicted employees: Sales Assistant Patricia Guerra; Senior Vice President and Financial Consultant Albert Halegoua; Administrative Manager John Brown; Sales Assistant and Cashier Dana Lindner; Officer Manager Alex Dever; and Cashier Margaret Furey.

Shearson contends that at trial it will raise a statutory vicarious liability defense to all of the crimes charged. *See* Motions and Memorandum of Law of Defendant Shearson Lehman Brothers, Inc. to Dismiss the Indictment 15 n. 3.

have committed no crime. Moreover, they argue, no law requires that they inform financial institutions that they have structured their transaction to avoid the statutory reporting requirements.

■ In one respect, defendants are correct: the currency reporting laws impose no affirmative obligations on individuals to disclose to the government the nature of their currency transactions. *See* 31 U.S.C. § 5313(a) (domestic financial institutions must file); 31 C.F.R. § 103.22(a)(1) (CTR required only if transaction in currency exceeds $10,000). In order for Shearson and the individual defendants to violate the law, liability must stem from their actions that caused the banks to breach a statutory duty.[5] The government concedes as much, and therefore charges defendants with a criminal violation based on 18 U.S.C. § 2(b), which provides:

> Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

*Id.*

### (A) *The Common Denominator: The Bank's Duty*

The common theme running throughout the indictment is that defendants' liability depends on whether the banks had a duty to file CTRs under the facts of this case. For example, the counts charging the violation of 31 U.S.C. §§ 5313, 5322 and 18 U.S.C. § 2 state that defendants caused banks to fail to file CTRs. This charge is based on the bank's statutory duty to file CTRs in certain cases. Similarly, the counts under 18 U.S.C. §§ 1001 & 2 allege that defendants concealed and caused to be concealed material facts by designing their transactions to mislead banks into believing they had no duty to report the transaction to the government. If the law imposes no

duty on banks under the facts of this case, defendants cannot be charged with concealment. Finally, defendants are charged under 18 U.S.C. § 371 with conspiring to defraud the government by impeding the collection of data required in the CTRs. As with the other charges, defendants could not conspire to defraud the United States unless they agreed to prevent banks from reporting required information. The individuals themselves are not required to supply any information to the government.[6] Thus, the viability of each currency-related count in the indictment turns on the duty question.

Rather than launch immediately into an examination of each count, a detailed analysis of the duty issue, which transcends all counts, will simplify this task and clarify the confusion that has inevitably accompanied government prosecutions under this theory. As the indictment sets forth, defendants' liability on all counts depends on the existence of a bank's duty to file CTRs when a customer has intentionally structured a transaction to avoid a government-required filing. Only if a bank is capable of violating the law, can defendants be liable under the statutory scheme of 18 U.S.C. § 2(b). Although *Heyman*, 794 F.2d 788, is persuasive on the issue of liability under § 2(b), that court never satisfactorily addressed the threshold question of how the bank's failure to file CTRs upon receiving a structured transaction violated § 5313.

### (B) *The Government's Position*

Apparently recognizing the *Heyman* court's failure to establish a bank's filing duty when processing a structured transaction, the government has attempted to create a duty by relying on the instructions accompanying the CTR form (IRS Form 4789). The instruction reads:

---

5. This does not include the charge in Counts 48–60 in which Shearson is charged as a financial institution for failure to file. Shearson clearly falls within the statute with respect to those counts, and I therefore deny their motion to dismiss on that basis.

6. All individuals however, are obligated to report their earnings and income and to pay tax on that income as required under the Internal Revenue Code, 26 U.S.C. §§ 1–9602.

*Who must file.*—Each financial institution must file a form 4789 for each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to that financial institution, which involves a transaction in currency of more than $10,000. Multiple transactions by or for any person which in any one day total more than $10,000, should be treated as a single transaction, if the financial institution is aware of them. *See* Government Exh. "A".

Based on this instruction, the government has constructed the following argument:

(1) 31 U.S.C. § 5313(a) authorizes the secretary of treasury to enact regulations specifying when financial institutions must file CTRs.

(2) Under 31 C.F.R. § 103.22(a)(1), the secretary has required reports on every transaction involving $10,000 in currency. At the same time, the regulation requires that CTRs be made on forms prescribed by the secretary.

(3) The instructions on the CTR form state that multiple transactions, which in one day total more than $10,000, must be treated as a single transaction if the bank is aware of them.

(4) This instruction is the Treasury Department's interpretation of the requirement set forth in the statute and the regulations.

(5) As a result, banks have a duty to file CTRs for structured transactions if performed on the same day.

(6) Therefore, if the banks fail to file, individual defendants who structured are liable under 18 U.S.C. § 2(b).

*See* Government's Memorandum In Opposition to Defendants' Motions to Dismiss the Indictment 12–14.

Although initially appealing, the government's position contravenes established principles of administrative law—especially when viewed in the context of potential criminal liability. *See Reinis,* 794 F.2d at 508.

The dispositive inquiry is whether the instruction on CTR Form 4789 is a form of agency rule making and regulation or merely an agency's interpretation of a statute or regulation. If viewed as a rule or regulation, the instruction on Form 4789 cannot be a basis for liability because the agency failed to promulgate it with the required opportunity for notice and comment. *See* 5 U.S.C. §§ 553(b), 551(4); *Reinis,* 794 F.2d at 508 (citing, *United States v. Richter,* 610 F.Supp. at 489 & n. 10; *United States v. $200,000 in United States Currency,* 590 F.Supp. 866 (S.D.Fla. 1984)). If viewed as an interpretation, as the government contends, the instruction need not be enacted with notice and comment safeguards. *See* 5 U.S.C. §§ 553(b)(A). Interpretations are an agency's opinion of a statute's meaning, *see Haddon Twp. Board of Education v. New Jersey Dept. of Education,* 476 F.Supp. 681, 691 (D.N.J.1979), but are nevertheless entitled to judicial deference. *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). The distinguishing characteristic between an interpretation and a regulation is that a rule or regulation actually implements a statute "and in so doing, 'creates' new law 'affecting individual rights and obligations.'" *State of New Jersey v. Dept. of Health and Human Services,* 670 F.2d 1262, 1282 (3d Cir.1981), (citations omitted). Moreover, in many cases, agency interpretations are used to resolve "relatively technical, unimportant considerations." *Id.*

■ Applying these principles to Form 4789, I conclude that the instruction is a legislative rule promulgated without the required notice and comment procedure, and therefore is ineffective in the context of a criminal prosecution. The instruction does more than state the agency's view on how it intends to administer the law. Instead, it ignores the safeguards envisioned by Congress in the Administrative Procedure Act and imposes a new duty on banks to aggregate transactions. An agency cannot shortcut the law by issuing a legislative rule in "'interpretative clothing.'" *State of New Jersey,* 670 F.2d at 1281. Therefore, defendants' liability in this case hing-

es on whether the existing regulations—without benefit of the Form 4789 instruction—create a duty for banks to file CTRs. *See California Bankers Ass'n*, 416 U.S. at 26, 94 S.Ct. at 1500.

### (C) *The Richter Approach*

My examination of the statutes and regulations convinces me that defendants have been properly charged. This view however, is not based on the instruction on Form 4789, which would impose a duty on banks to aggregate multiple transactions by or for a single person in the same day. Instead, I hold that 31 U.S.C. § 5313 and 31 C.F.R. § 103.22 create a more fundamental duty: an obligation to report transactions in excess of $10,000. Defendants' actions have caused banks to breach this undisputed duty.

Central to the split of authority in these cases is the manner in which courts present the underlying issue. For example, the Ninth Circuit in striking prosecutions for CTR violations has framed the issue as follows:

> We are required to determine whether the Currency Transaction Reporting Act and regulations promulgated pursuant to the Act imposed a duty on appellants to inform the banks of the nature of their currency transactions.

*United States v. Varbel*, 780 F.2d 758, 760 (9th Cir.1986). *Accord Anzalone*, 766 F.2d at 682. Phrased this way, the court simplifies its task. Even the government does not contend that the statutory scheme imposes a duty on individuals to "inform banks of the nature of the currency transaction." *See Varbel*, 780 F.2d at 760. Instead, the key inquiry is whether defendants have somehow caused financial institutions to breach a statutory duty to report currency transactions over $10,000. *See* 31 U.S.C. § 5313; 18 U.S.C. §§ 2, 1001.

My starting point is the plain language of the statute and the regulation. In 31 U.S.C. § 5313, Congress authorized the Secretary of the Treasury to enact regulations specifying when CTRs are required. Pursuant to this delegation, the Secretary

of Treasury, in 31 C.F.R. § 103.22(a)(1), required banks to file reports on every transaction exceeding $10,000. Therefore, the statutory scheme imposes a duty on banks to report any transaction exceeding $10,000. Defendants were on notice of the banks' reporting duty, which exists without regard to the duty to aggregate that the government sought to impose by means of the Form 4789 instruction. *See Anzalone*, 766 F.2d at 684 (Aldrich, J. concurring). As a result, defendants cannot act to prevent a bank from fulfilling its duty, thereby causing a bank to commit a crime. *See id.*; 18 U.S.C. § 2. Defendants did not cause the bank to breach its duty when they entered the bank with structured transactions; they caused the bank to violate the law at the earlier point when they broke up their transaction to avoid the $10,000 CTR requirement. At that point, defendants committed the criminal acts charged in the indictment. *Richter*, 610 F.Supp. at 489–90; *Gimbel*, 632 F.Supp. at 753–54.

This rationale was set forth in *Richter*, which like this case, involved multiple deposits exceeding $10,000 in one day at the same bank by or for the same individual. Under § 5313 and 18 U.S.C. § 2, the *Richter* court noted that the offense charged was intentionally causing the bank not to file a CTR. *Richter*, 610 F.Supp. at 489. Defendants caused this failure to file by breaking up a large sum of money into several smaller sums and, "under § 2, it is *these* acts, 'if directly performed by' bank officials which would violate § 5313." *Id.* (quoting 18 U.S.C. § 2) (emphasis in original). The alleged crime is not the failure of a bank to file when a customer comes into its office with a multiple deposit totalling $10,000. *Id.* at 489–90.

> Even if the bank had no duty to file a CTR in the multiple deposit situation, *the crime had already been committed:* the defendants had intentionally structured their transactions to evade the reporting requirements of the Act. The crime was breaking up the deposits to cause the bank to fail to file a CTR where it would

have done so had the deposits not been broken up. The relevant duty—the existence of which is not disputed—is the duty of the bank to file CTRs for single deposits of more than $10,000. The defendants allegedly caused the bank not to fulfill *this duty*. The other, later "duty"—whether the bank is required to report transactions *already* broken into increments—is irrelevant here. It does not matter whether the defendants caused the bank not to fulfill this possible duty.

*Id.* at 490 (emphasis in original).

Defendants are properly charged with criminal liability. While on notice of the banks' duty, defendants devised an elaborate scheme to conceal the true nature of their transaction from the financial institutions. Unlike an occasional or unintended multiple transaction in the same day at the same bank, defendants engaged in a sophisticated pattern of conduct over a prolonged period of time. Defendants planned to mislead banks concerning the true nature of the transactions and their actions caused banks to breach their statutory reporting duty.

### (D) *The Pivotal Role of 18 U.S.C. § 2*

This reasoning, of course, is based on the validity of 18 U.S.C. § 2 in criminal prosecutions such as this. Under § 2(b), an individual is punished as a principal if he willfully causes an act to be done, which if performed by another, would be a criminal offense. *See* 18 U.S.C. § 2; *United States v. Catena*, 500 F.2d 1319, 1323 (3d Cir.), *cert. denied*, 419 U.S. 1047, 95 S.Ct. 621, 42 L.Ed.2d 641 (1974). Here, defendants are charged with breaking up large currency transactions in such a way that financial institutions will fail to file CTRs. If these same acts were performed by banks, the banks would be subject to criminal liability. Therefore, under § 2, defendants must also be subject to criminal liability.

Application of § 2(b) has been fully outlined in *Heyman*, 794 F.2d at 791–92, and *United States v. Tobon-Builes*, 706 F.2d 1092, 1099–1101 (11th Cir.1983), both of which are factually similar to this case. Section 2(b) supports imposition of liability in the context of causing the failure to file CTRs. By enacting § 2(b), Congress sought "to hold criminally liable those who cause others to commit crimes, without regard to the guilt or innocence of the intermediary or the legal capacity of the defendant to commit the crime." *Heyman*, 794 F.2d at 791. *See also Tobon-Builes*, 706 F.2d at 1099. *Accord Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954) (under mail fraud statute, defendants who never mailed anything can be convicted of mail fraud because they caused stolen property to be mailed); *Catena*, 500 F.2d at 1323 (doctor convicted of causing insurance carrier to submit false Medicare claims to United States). Here, although the banks had no criminal intent, they had the capacity to commit the crime. By breaking up bank transactions, defendants caused the banks to fail to file the required CTRs and therefore defendants are liable under § 2(b). *See, e.g., Heyman*, 794 F.2d at 791; *United States v. Cook*, 745 F.2d 1311, 1315 (10th Cir.1984), *cert. denied*, 469 U.S. 1220, 105 S.Ct. 1205, 84 L.Ed.2d 347 (1985).

None of the cases relied on by defendants dispute the applicability of § 2(b) to impose criminal liability.[7] In fact, courts in those cases rejected government arguments for liability under § 2 only because they found that the government had not first established the existence, and subsequent breach, of some statutory duty.[8]

---

**7.** *But see United States v. Perlmutter*, 636 F.Supp. 219, 225–26 (S.D.N.Y.1986), which has doubtful precedential value as a result of the Second Circuit's subsequent holding in *Heyman*, 794 F.2d at 791.

**8.** *See, e.g., Larson*, 796 F.2d at 247 (defendants' conviction under § 2 fails because banks com-

mitted no offense by failing to file CTRs); *Reinis*, 794 F.2d at 508 (defendants cannot be guilty under § 2 because bank did not violate law); *Dela Espriella*, 781 F.2d at 1435 (defendants did not violate § 2 because the individual transactions were perfectly legal); *Varbel*, 780 F.2d at 762 (indictment under § 2 must fail because defendants had no duty to reveal structured

Having concluded that the Act and regulations impose a duty on the banks, I find that the established principles of § 2(b) are applicable to hold defendants liable for causing banks to fail to fulfill that duty.[9]

Further, many of the cases relied on by defendants are inapposite because they were not limited, as here, to charges based on the purchase of more than $10,000 worth of checks at a single bank in a single day by or for the same person. *See, e.g., Dela Espriella,* 781 F.2d at 1435 (transaction at 19 different banks); *Varbel,* 780 F.2d at 759 (six checks at different banks on different days); *United States v. Denemark,* 779 F.2d 1559, 1561 (11th Cir.1986) (fourteen checks purchased at fourteen banks). *Cf. Anzalone,* 766 F.2d at 679 (twelve checks on twelve separate days).[10] In the remaining cases that reject structuring prosecutions, *see, e.g., Reinis,* 794 F.2d at 508, those courts found no duty, whereas I have read the statutory scheme to impose a duty and therefore establish criminal liability.

### (E) *Application of the Duty Analysis to Each Charge*

Under 31 U.S.C. § 5313 and 18 U.S.C. § 2, defendants are charged with knowingly and willfully causing banks to fail to file CTRs while conducting and aiding and abetting an illegal gambling enterprise (18 U.S.C. § 1955), and as part of a pattern of illegal activity involving more than $100,000 in a 12-month period. (31 U.S.C. § 5322(b)). Having established that the financial institutions have a duty to report transactions exceeding $10,000 under the facts of this case, I conclude that the indictment properly charges defendants under § 2 with causing banks to fail to report these transactions. By intentionally breaking up their transactions to avoid the $10,000 reporting requirement, defendants knowingly and willfully caused banks to violate § 5313. *See, e.g., Heyman,* 794 F.2d at 791; *Cook,* 745 F.2d at 1314; *Richter,* 610 F.Supp. at 480.

Similarly, the indictment properly alleges that defendants violated 18 U.S.C. §§ 1001 & 2 by knowingly and willfully concealing or causing to be concealed material facts from the United States. Because financial institutions have a duty to report facts relating to the transactions at issue, defendants are liable under § 2 for causing the concealment of these facts. Indeed, Congress omitted the "causing" language from § 1001 because of its presence in § 2(b). *Tobon-Builes,* 706 F.2d at 1099. Certainly, the banks would have a duty to report the material facts of this transaction if they had known the true nature of defendants arrangement. *See United States v. Puerto,* 730 F.2d 627, 632–33 (11th Cir.), *cert. denied sub nom. Everett v. United States,* 469 U.S. 847, 105 S.Ct. 162, 83 L.Ed.2d 98 (1984). Moreover, defendants' nondisclosure was more than a passive failure to act; it was an act of concealment undertaken pursuant to a detailed scheme. *See Gimbel,* 632 F.Supp. at 754–55. By structuring their transaction, defendants engaged in an affirmative act to disguise

transactions and because banks had no corresponding duty to file CTRs); *Anzalone,* 766 F.2d at 682 (charges based on § 2 must fail because reporting Act and regulations impose no duty on defendants).

**9.** My conclusion is not influenced by the Secretary of Treasury's recent proposal to amend 31 C.F.R. § 103.22 to clarify the bank's reporting duty. *See* 797 F.2d 817 (1986). Under this proposal, the Secretary would amend the C.F.R. to incorporate the duty to aggregate deposits presently in Form 4789. More importantly, the proposal would require bank customers to sign a report for all transactions exceeding $3,000. The customer would be required to certify whether he has made other currency transactions exceeding $10,000 on that day. In effect, the customer will be required to inform the bank of structured transactions. Although this proposal is an overdue clarification of this area of the law, it does not require that I declare the existing statutory scheme insufficient to state a crime against defendants.

**10.** In *Anzalone,* defendants purchased three checks totaling $25,000 from the same bank on the same day. However, because the government did not charge the $25,000 transactions separately, the court did not distinguish the transactions on the same day from the transactions on separate days. 766 F.2d at 684 (Aldrich, J. concurring).

the total amount of money involved in the deal. *Id.* at 755. The ultimate effect of defendants' practice was the concealment of material facts from the government by the bank's failure to file a CTR.

Finally, these same principles demonstrate that defendants are properly charged under 18 U.S.C. § 371 with conspiracy to defraud the United States by preventing the government from: (1) collecting data from CTRs; (2) enforcing the Bank Secrecy Act; and (3) collecting income taxes. *Dennis v. United States,* 384 U.S. 855, 861, 86 S.Ct. 1840, 1844, 16 L.Ed.2d 973 (1966); *United States v. Shoup,* 608 F.2d 950, 963–64 (3d Cir.1979). Defendants again contend that they cannot be charged with conspiracy because their structured transactions were not reportable. *See United States v. Cogswell,* 637 F.Supp. 295, 299–300. (N.D.Cal.1985). This argument is without merit however, because I have already concluded that defendants activity was unlawful. *See United States v. Giancola,* 783 F.2d 1549, 1551–53 (11th Cir.1986); *Puerto,* 730 F.2d at 630–31. Defendants themselves had no duty to file a CTR, but they had a duty not to cause banks to fail to file a CTR. *See Discussion Part II, supra.* Moreover, apart from the underlying substantive offense, defendants are liable for agreeing to deceive or trick the government. I conclude therefore that the indictment sufficiently sets forth a fraudulent scheme. Although individual acts of breaking transactions into smaller amounts were lawful if innocently performed, these acts "lost their lawful character when considered as part of a scheme to intentionally deprive the government of material information it would otherwise receive." *Richter,* 610 F.Supp. at 487. *See also United States v. Hajecate,* 683 F.2d 894, 896–97 (5th Cir. 1982), *cert. denied,* 461 U.S. 927, 103 S.Ct.

2086, 77 L.Ed.2d 298 (1983) (acts that are themselves legal lose their legal character when they become elements of an unlawful scheme).[11]

III. *Are the Statutes Unconstitutionally Vague?*

Although the statutory schemes set forth in the indictment properly charge defendants with a crime, defendants nonetheless maintain that these statutes are unconstitutionally vague. Specifically, defendants charge that the statutes violate the due process guarantee of the Fifth Amendment by failing to give them adequate notice that their conduct was illegal. Once again, courts are divided on this issue. *Compare Heyman,* 794 F.2d at 792–93; *Cook,* 745 F.2d at 1315–16; *Gimbel,* 632 F.Supp. at 755 *with Larson,* 796 F.2d at 246; *Varbel,* 780 F.2d at 762; *Anzalone,* 766 F.2d at 682. Although our Court of Appeals has not addressed this issue, I do not write on a clean slate.

Vagueness challenges must be decided with two principles in mind. First, laws imposing criminal sanctions must be strictly construed. *See, e.g., United States v. Enmons,* 410 U.S. 396, 411, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973); *Anzalone,* 762 F.2d at 680. Second, the law must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited. *See, e.g., Kolender v. Lowson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *Anzalone,* 762 F.2d at 678. Courts striking convictions under 31 U.S.C. § 5313 and 18 U.S.C. §§ 1001 & 2 have observed that the liability scheme is ambiguous and that the government has created, and possibly acquiesced in, that ambiguity. *See, e.g., Varbel,* 780 F.2d at 762; *Anzalone,* 766 F.2d at 681. Defendants raised similar allegations here, but as in *Anzalone, Varbel,*

---

**11.** Liability for innocent acts done with a criminal intent is not a new phenomenon in the law.

In some cases, actual malice or intent, and the common meaning of those words is an element in crime. But it will be found that, when it is so, it is because the act when done maliciously is followed by harm which would not have followed the act alone, or because the intent raises a strong probability that an act, innocent in itself, will be followed by other acts or events in connection with which it will accomplish the result sought to be prevented by the law.

O.W. Holmes, *The Common Law* 76 (1938).

and *Larson,* their claim is tied to the erroneous premise that the statutory scheme cannot state a crime because it imposes no duty on defendants. By phrasing the issue this way, defendants, and the courts that have adopted their position, have apparently viewed the various statutes in a vacuum.

As I noted earlier, § 1001 and § 5313 must be read in light of the undisputed applicability of § 2 to the facts of this case. Viewed this way, defendants' intentional structuring scheme properly states a crime of causing banks to fail to file CTRs and to conceal material facts from the government. Defendants are not charged with failing to file CTRs. They had no duty to do so and the government relied on the "causing" theory of liability set forth in § 2. By maintaining that they were not on notice of the criminal nature of their activity, defendants in effect eviscerate the meaning of § 2 in the indictment. *See Cook,* 745 F.2d at 1315–16 (§ 5313 read with § 2 makes it forseeable and reasonable that bank customers would be on notice that their conduct was prohibited).

In addition, defendants' contention that they were not on notice that their conduct was criminal ignores prior judicial explication of prosecutions under identical statutes. *See Rose v. Locke,* 423 U.S. 48, 53, 96 S.Ct. 243, 245, 46 L.Ed.2d 185 (1975) (prior judicial interpretations of statutes prescribing "crimes against nature" precludes defendant from claiming that he had no notice that his conduct was prohibited). Here, defendants allegedly committed the criminal acts between 1982 and 1985. Until 1985, all courts addressing prosecutions for structuring had upheld the statutes. *See, e.g., United States v. Massa,* 740 F.2d 629 (8th Cir.1984), *cert. denied,* 471 U.S. 1115,

105 S.Ct. 2357, 86 L.Ed.2d 258 (1985); [12] *Tobin-Builes,* 706 F.2d at 1101; *United States v. Thompson,* 603 F.2d 1200, 1203–04 (5th Cir.1979); *United States v. Sanchez Vazquez,* 585 F.Supp. 990, 992–93 (N.D.Ga.1984); *Konefal,* 566 F.Supp. at 701–02. These decisions, together with the language of § 5313 and 18 U.S.C. §§ 1001 & 2 put defendants on notice that their elaborate scheme was prohibited. *See Heyman,* 794 F.2d at 792; *Gimbel,* 632 F.Supp. at 756.

Finally, any vagueness in the law is mitigated when a statute is drafted with a scienter requirement. *See, e.g., Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). The "willful" requirement in § 2 "provides adequate protection for individuals who might unwittingly stumble into a violation of federal law." *Heyman,* 794 F.2d at 792. *See also Boyce Motor Lines,* 342 U.S. at 342, 72 S.Ct. at 331; *United States v. Lampley,* 573 F.2d 783, 787 (3d Cir.1978) (specific intent requirement renders unconvincing defendant's vagueness claim). Thus, by making criminal only willful conduct that causes banks to violate the statutory prohibition, the law is not unconstitutionally vague.

Courts such as *Anzalone* and *Varbel,* which have upheld vagueness challenges, have emphasized that the statutes are poorly drafted. I agree that Congress and the Secretary of the Treasury could have clarified the circumstances under which individual defendants may be held liable.[13] Nevertheless, the prohibition against excessive vagueness does not require that I invalidate every statute that might have been drafted with more precision. *See Rose,* 423 U.S. at 49, 96 S.Ct. at 243.[14]

---

**12.** The viability of the Eighth Circuit's holding in *Massa* has been questioned and possibly overruled by the subsequent decision in *Larson,* 796 F.2d at 246–47.

**13.** In fact, they have done so. *See supra,* nn. 1 & 9.

**14.** Defendants also claim that the reporting requirements of § 5313 violate their Fourth Amendment right to privacy and their Fifth

Amendment privilege against self-incrimination. I reject the Fourth Amendment argument because defendants have not established—or even argued—that any search or seizure has occurred. *See Giancola,* 783 F.2d at 1553; *Richter,* 610 F.Supp. at 493; *Sanchez Vazquez,* 585 F.Supp. at 990. Similarly, I reject defendants' Fifth Amendment claim because the statutes do not require disclosure of information substantially likely to incriminate defendants. *See, e.g.,*

#### IV. *Defendant Shore's Motions to Dismiss*

■ Defendant Sheldon Shore raises an additional ground for dismissing Counts 38 and 58 as they apply to him. Unlike the other defendants, Shore is not charged with violating the Bank Secrecy Act while conducting an illegal gambling business or as part of a pattern of illegal activity involving transactions of more than $100,000 in a 12-month period. Shore's claim however, goes to sufficiency of evidence and must be reserved for trial. The indictment charges him with the § 5313, 5322 and § 2 violations committed in furtherance of an illegal gambling enterprise. Simply because Shore is not charged under the other counts stating gambling offenses does not *ipso facto* mean that the grand jury failed to find sufficient proof of these charges. By charging Shore with specific acts in furtherance of an illegal gambling enterprise, the indictment states all essential elements of the crime. *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974) (indictment sufficient if it contains elements of offense). Whether the government has sufficient evidence of these charges is a question for trial. *See Costello v. United States*, 350 U.S. 359, 363–64, 76 S.Ct. 406, 408–09, 100 L.Ed. 397 (1956) (although indictment for tax fraud was based solely on hearsay evidence, motion to dismiss was denied because claim must be made during trial). Once a grand jury indicts, no inquiry may be made concerning the sufficiency of the evidence it considered. *United States v. Shober*, 489 F.Supp. 393, 417 (E.D.Pa. 1979).[15]

#### V. *Motions to Dismiss the Gambling Counts*

■ Defendants Joseph Mastronardo, Jr., Joseph Mastronardo, Sr., and John Mastronardo seek dismissal of Counts 4 through 24, which charge them with violating 18 U.S.C. § 1952 by using interstate phone service in aid of a gambling enterprise. They contend that the counts fail to allege specific overt acts. In response, the government maintains that the indictment meets the specificity test set forth in *United States v. Wander*, 601 F.2d 1251, 1258 (3d Cir.1979). The indictment alleges overt acts by charging that defendants:

> did thereafter promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on, of the illegal gambling business.

The indictment is sufficiently specific. *United States v. Kenny*, 462 F.2d 1205, 1213–14 (3d Cir.), *cert. denied*, 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972); *United States v. Shaffer*, 383 F.Supp. 339, 341 (D.Del.1974) (*citing United States v. Nichols*, 421 F.2d 570, 573–74 (8th Cir. 1970); *United States v. Teemer*, 214 F.Supp. 952, 956–57 (N.D.W.Va.1963)).

■ Defendant John Mastronardo also contends that the entire indictment must be dismissed because the government intentionally misrepresented that he was a "subject," but not a "target" of the grand jury investigation. I disagree. First, the government is not required to advise defendant that he is targeted for possible prosecution. *United States v. Washington*, 431 U.S. 181, 188–89, 97 S.Ct. 1814, 1819, 52 L.Ed.2d 238 (1977); *United States*

---

*Marchetti v. United States*, 390 U.S. 39, 47–48, 88 S.Ct. 697, 702, 19 L.Ed.2d 889 (1968) (invalidating tax statute that required disclosure of gambling revenues). The Bank Secrecy Act requires banks to report large currency transactions. These large currency transactions are not inherently illegal. Although designed as an investigatory tool in criminal and tax cases, CTR disclosures do not result in a direct nexus with criminal liability. *See Giancola*, 783 F.2d at 1553; *Richter*, 610 F.Supp. at 491, 492; *Sanchez Vazquez*, 585 F.Supp. at 996.

**15.** Shore also seeks dismissal of Count 55 for failure to charge a crime because his actions involved checks and not currency as required in 31 C.F.R. § 103.22(a)(1). His argument ignores the true nature of the charges in the indictment. Shore is charged under Count 55 with transferring $39,000 in currency to Shearson. Count 38 meanwhile, charges that those funds were subsequently converted into cashier's checks at several banks. Thus, in both counts, Shore is charged with violations involving currency.

*v. Caputo*, 633 F.Supp. 1479, 1488 & n. 8 (E.D.Pa.1986) (potential defendant has no right to warning that he is a target witness before grand jury). The government is under no obligation to give any defendant a report of his status. Second, prosecutorial misconduct would justify dismissal under these facts only if defendant was prejudiced by the misrepresentation. *See United States v. Rosenfield*, 780 F.2d 10, 11 (3d Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 3294, 92 L.Ed.2d 709 (1986). Defendant's only claim of prejudice is that if he were classified as a target, the government could not compel him to testify. He cites no authority for this proposition other than an Internal Department of Justice guideline. *See U.S.A.M. 9–11.261.* To the extent that guideline is persuasive authority, defendant has misread it. In fact, the guideline states that a grand jury may subpoena a target. *Cf. Washington*, 431 U.S. at 181, 97 S.Ct. at 1815 (witness' target status in grand jury investigation adds nothing to the protection of Fifth Amendment rights). Moreover, even assuming that the prosecutors misled defendant concerning his status as a target, dismissal of the indictment would be inappropriate under the facts of this case. *See United States v. Crocker*, 568 F.2d 1049, 1056 (3d Cir.1977). *See also Caputo*, 633 F.Supp. at 1489–90 (although United States Attorney's Manual suggests that defendants should receive target warning, dismissal of indictment is not warranted where defendants were not prejudiced by absence of a warning).

Finally, defendants urge dismissal of the indictment because the government played tapes to the grand jury that were recorded in violation of the Pennsylvania Wiretapping and Electronic Surveillance Act, 18 Pa.Cons.Stat.Ann. § 5701 et seq. (Purdon 1983), and the Federal Wiretapping Statute, 18 U.S.C. §§ 2510–2520.

 Defendants reliance on the Pennsylvania law is misplaced. Even assuming that the recordings were made in violation of the Pennsylvania wiretap statute, they may be used in a federal prosecution as long as the information was lawfully obtained under federal law. *United States v. Armocida*, 515 F.2d 49, 51–52 (3d Cir.), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975). *See also United States v. Rickus*, 737 F.2d 360, 363–64 (3d Cir. 1984) (evidence obtained in accord with federal law is admissible in federal court even though it was obtained by state officers in violation of state law). Resolution of this issue turns on whether the prosecutors violate the federal law by playing the tapes.

 Defendants allege that the government violated 18 U.S.C. § 2517 by playing tapes that had been recorded in statutorily unauthorized manner. Apparently, defendants maintain that the government was required to obtain a court order authorizing the interception of the communications, *see* § 2516, or was required to obtain one party's consent, *see* § 2511. This argument ignores one vital fact: the government did not tape the conversations nor did it participate in the recording. The recordings were made by defendants as part of their illegal gambling operation, and subsequently obtained by the government under a valid search warrant for gambling paraphernalia. The government did not obtain the tapes in an unauthorized manner, nor did it violate the law by disclosing their contents to the grand jury. Any contrary holding would be inconsistent with the purposes of the statute. *See, e.g., Zweibon v. Mitchell*, 606 F.2d 1172, 1182 (D.C.Cir. 1979), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981) (statute designed to deter or prevent government from improperly invading individual privacy); *Application of the United States Authorizing Interception, Etc.*, 413 F.Supp. 1321, 1331 (E.D.Pa.1976) (statute attempts to balance individual privacy with need for limited government surveillance).

For the reasons stated, defendants' motions to dismiss the indictment are denied.