934 F.2d 320
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Frank M. VINSON, Defendant-Appellant.
 No. 90-5479.
 United States Court of Appeals, Fourth Circuit.
 Argued April 11, 1991.
Decided June 5, 1991.
As Amended June 21, 1991.
 
 Appeal from the United States District Court for the Southern District of West Virginia, at Charleston. John T. Copenhaver, Jr., District Judge. (CR-89-45-2)
 James McCall Cagle, Charleston, W.Va., for appellant.
 Mary Stanley Feinberg, Assistant United States Attorney, Charleston, W.Va. (Argued), for appellee; Michael W. Carey, United States Attorney, Charleston, W.Va., on brief.
 S.D.W.Va.
 AFFIRMED.
 Before ERVIN, Chief Judge, PHILLIPS, Circuit Judge, and CLYDE H. HAMILTON, United States District Judge for the District of South Carolina, sitting by designation.
 PER CURIAM:
 
 
 1
 Frank M. Vinson, former Executive Director of the Kanawha County, West Virginia Housing and Redevelopment Authority, appeals his convictions by a jury of (1) receiving unlawful payments of money for or on account of his official acts (four counts), 18 U.S.C. Sec. 201(g); (2) committing perjury before a grand jury investigating the payments, 18 U.S.C. Sec. 1623; and (3) making and using an illegal eavesdropping device in the office of his subordinate employee, 18 U.S.C. Sec. 2511. He also appeals the enhancement of his offense level on the perjury count. U.S.S.G. Sec. 2J1.3(b)(2). Finding no error, we affirm the convictions and sentence.
 
 I.
 
 2
 Frank M. Vinson served as Executive Director of the Kanawha County Housing and Redevelopment Authority ("KCHRA") from approximately 1979 until November 4, 1985. KCHRA carried out housing programs locally for the United States Department of Housing and Urban Development ("HUD"), from which it obtained virtually all of its funds. KCHRA was required to operate the housing authority in accordance with federal statutes, regulations and policies. Among the HUD programs administered by KCHRA was the "Section 8 program," in which HUD funds were used as rent subsidies for low-income tenants.
 
 
 3
 As Executive Director, Frank Vinson was responsible for the Section 8 housing program in Kanawha County during the fall of 1983. During the same time period, he agreed to manage the High Street Apartments, located in adjacent Clay County, West Virginia. The evidence showed that Vinson was hired with the understanding that he would develop the Section 8 program for the High Street Apartments. Although the first management agreement actually named KCHRA as manager, Vinson was the individual within KCHRA expected to make the management decisions. A subsequent management agreement named Highlawn Realty Group, a corporation owned and controlled by Vinson, as manager of the High Street Apartments.
 
 
 4
 As manager of the High Street Apartments, Vinson received rent checks, deposited those checks, paid expenses, supervised an on-site manager, approved repairs and purchases, and filed monthly reports with the Farmers Home Administration. When Vinson began managing the apartments, no tenants were receiving Section 8 rent subsidies from KCHRA or HUD.
 
 
 5
 In March 1984 KCHRA began administration of the Section 8 tenants in Clay County. Frank Vinson directed his KCHRA staff to conduct outreach programs in Clay County and recruit qualifying individuals for the Section 8 program. On July 1, 1984, eight of the Clay County residents who became eligible for the Section 8 rent subsidy payments moved into the High Street Apartments. From July 1984 through March 1985, the West Virginia Housing Development Fund issued housing assistance payment ("HAP") checks for the Clay County Section 8 tenants. KCHRA performed all other administrative duties, including inspections, with respect to the Section 8 tenants during this period.
 
 
 6
 Effective April 1, 1985, KCHRA began issuing the HAP checks for the Clay County Section 8 tenants. Consequently, Vinson, as Executive Director of the KCHRA, was signing HAP checks that were then deposited into an account for which he, as manager, was the authorized signature.
 
 
 7
 During 1984 and 1985, management fees for the High Street Apartments, payable to Vinson or Highlawn Realty Group, were accruing at the rate of more than $20.00 per unit per month. Vinson paid himself the fees periodically during 1984 and the first quarter of 1985, but ceased writing himself management fee checks in March 1985. After he had been fired as KCHRA's Executive Director in November 1985, he wrote himself one additional management fee check covering the period March through December 1985.
 
 
 8
 One of KCHRA's duties relating to the High Street Apartments was to ensure that the units met federally-mandated housing quality standards. The failure to pass inspection would result in HAP checks being withheld by KCHRA. On one occasion, Vinson learned that rent checks for July and August 1985 had not been issued because a KCHRA employee had failed a High Street Apartment unit. The evidence indicated that Vinson changed the entry on the inspection form and back-dated it to July 1, 1985 so that all back rent would be paid.
 
 
 9
 In the fall of 1984, Sally Slack, the KCHRA employee responsible for Section 8 tenants, learned that Vinson was privately managing the High Street Apartments. When Slack confronted Vinson, the testimony was that Vinson readily acknowledged his position. Slack raised the issue of a violation of a contract provision between HUD and KCHRA prohibiting conflicts of interest in housing properties, causing Vinson to become angry and reply that it was none of her business. When Slack later confronted Vinson again about his management of the High Street Apartments, Vinson advised her that if she did not want to follow his policies, she could leave her employment with KCHRA.
 
 
 10
 Slack informed two board members of KCHRA about Vinson's management of the High Street Apartments, and at a November 4, 1985 meeting, the Board confronted Vinson with this information. According to the testimony, Vinson admitted his role as manager of the High Street Apartments and acknowledged that he was receiving management fees. He did not assert at that time that the Board had ever authorized or approved his actions. From the minutes of meetings of the Board of Directors of KCHRA and the testimony of Board members, there was no evidence to suggest that Vinson had, prior to November 4, 1985, advised the Board of his receipt of management fees on the High Street Apartment complex.[1] Vinson was fired by the Board of Directors of KCHRA on November 4, 1985.
 
 
 11
 Around this same time, Vinson hired an individual to install a "bug" or eavesdropping device in Slack's office. Vinson financed the purchase of the electronic devices, paid the individual to install the "bug," let him in the building late at night, and showed the individual where to install the "bug." The location of the "bug" left little doubt that Slack was Vinson's target.
 
 
 12
 Slack testified that she began to suspect that her conversations were being overheard. She explained that on one occasion when she was talking to Board member Albert Harris, Vinson called her and said: "I know you are talking to Albert Harris. I know everything you do." This exchange prompted her to examine her office for a listening device, but she was unsuccessful in locating the "bug."[2]
 
 
 13
 On June 2, 1988, Frank Vinson voluntarily appeared before a federal grand jury, and answered questions about his receipt of management fees. He testified on that occasion that KCHRA's Board of Directors had known about his private management of the High Street Apartments, and had approved his outside employment activity. He stated to the grand jury that the Board's approval "should be in the minutes of the Authority." Vinson continued to assert under oath at trial that the Board had approved his receipt of management fees on the High Street Apartments.
 
 II.
 
 14
 On appeal from his convictions for violating 18 U.S.C. Sec. 201(g) (Counts 2, 3, 4 and 5), Vinson argues that the trial court deprived him of his sixth amendment right to a jury trial when it instructed the jury as a matter of law that Vinson, at the times and places named in the indictment, was a public official. See 18 U.S.C. Sec. 201(a). Citing United States v. Johnson, 718 F.2d 1317 (5th Cir.1983), Vinson contends that this was an essential element of the offense and should have been submitted to the jury for its determination.
 
 
 15
 Under the facts of this case, Vinson's reliance on Johnson is misplaced. There is no fact in issue regarding Vinson's status as a public official. At all times relevant to his convictions under 18 U.S.C. Sec. 201(g), the nature of Vinson's duties and responsibilities were essentially federal. Dixson v. United States, 465 U.S. 482, 496 (1984) (To be a public official under 18 U.S.C. Sec. 201(a), an individual must possess some degree of official responsibility for carrying out a federal program or policy). See also United States v. Strissel, 920 F.2d 1162, 1165-66 (4th Cir.1990), citing United States v. Velazquez, 847 F.2d 140 (4th Cir.1988) (person who occupies a position of public trust with official federal responsibilities is a public official under Sec. 201). Because there is no question in this case about Vinson's status as a public official, this argument is without merit.
 
 III.
 
 16
 Vinson also argues on appeal that the evidence was insufficient to establish a violation under 18 U.S.C. Sec. 201(g). We cannot agree.
 
 
 17
 As the district court pointed out in its charge to the jury, this is not a case in which conflicts of interest were charged as crimes, but one in which violations of criminal statutes were charged. The district court correctly charged the jury in these regards and there was substantial evidence to support Vinson's convictions.
 
 
 18
 Vinson's argument that the facts of this case do not fall within the scope of 18 U.S.C. Sec. 201(g) is without merit. The presence of the word "bribery" in the heading of this statute is certainly not dispositive of its scope. The evidence showed that Vinson received unauthorized compensation for an official act. The absence of a middleman is not crucial for these purposes, and the government proved each element of the offense charged.
 
 
 19
 Vinson clearly had two masters, and thus divided loyalties, when as Executive Director of KCHRA he was responsible for accepting eligible tenants into the Section 8 program, inspecting approved housing, issuing HAP checks to landlords, and generally discharging his duties as Executive Director. On the other hand, as manager of the High Street Apartments he was responsible for the overall management of the complex, which included developing a tenant base for the Section 8 programs, inspecting the apartments, and collecting rent, including HAP checks. From these dual roles, it is readily apparent that if Vinson, in his capacity as Executive Director of KCHRA, had not approved the Section 8 tenants for High Street Apartments, the HAP checks would not have been available as a source of funds with which to pay management fees to Vinson. When Vinson back-dated the inspection form to July 1, 1985 so as to approve units for the federally-mandated housing quality standards, he clearly demonstrated that his official judgment was clouded by his personal financial interest as manager of the High Street Apartments. See United States v. Evans, 572 F.2d 455 (5th Cir.1978).
 
 
 20
 We are satisfied that the government proved the necessary elements to establish a violation of section 201(g).
 
 IV.
 
 21
 In appealing his conviction for perjury, Vinson argues that the materiality of the alleged perjury was lacking and that the district court erred when it instructed the jury as a matter of law that the allegedly perjurious statements were material. 18 U.S.C. Sec. 1623. This argument is factually flawed and lacking in legal precedent.
 
 
 22
 First, it was reasonable for the jury to conclude that Vinson attempted to impede and obstruct the grand jury's inquiry into his receipt of management fees from the High Street Apartments when Vinson told the grand jury that the KCHRA Board of Directors knew of his management role and approved of his actions in this position. Such testimony by Vinson was directly relevant and material to his state of mind, whether he knowingly and willfully violated any federal law, or whether he acted innocently with the approval of the KCHRA Board of Directors.
 
 
 23
 Materiality is defined as the "natural effect or tendency to impede, influence or dissuade the grand jury from pursuing its investigation." United States v. Paolicelli, 505 F.2d 971, 973 (4th Cir.1974). "The inquiry into materiality assesses potential. It considers whether the false statement was 'capable of influencing the grand jury on the issue before it.' " United States v. Friedhaber, 856 F.2d 640, 642 (4th Cir.1988) (en banc). The element of materiality in a perjury case is a question of law for the court. Kungys v. United States, 485 U.S. 759 (1988); United States v. Bailey, 769 F.2d 203 (4th Cir.1985); Sinclair v. United States, 279 U.S. 263 (1929). This Court has so held in numerous perjury, false document and false statement cases. See, e.g., United States v. Friedhaber, 856 F.2d 640 (4th Cir.1988); United States v. Flowers, 813 F.2d 1320 (4th Cir.1987); United States v. Whaley, 786 F.2d 1229 (4th Cir.1986); United States v. Paolicelli, 505 F.2d 971 (4th Cir.1974); United States v. Ivey, 322 F.2d 523 (4th Cir.), cert. denied, 375 U.S. 953 (1963). We decline Vinson's invitation to reconsider this well-established principle.
 
 
 24
 In view of the grand jury investigation into possible violations of Section 201 and other criminal statutes regarding conflicts of interest, bribery and receipt of unlawful payments, Vinson's testimony before the grand jury was unquestionably material to its investigation. The district court correctly charged the jury that the matter involved in the alleged false testimony was material as a matter of law.
 
 V.
 
 25
 Vinson challenges his conviction under 18 U.S.C. Sec. 2511 on the basis that the evidence failed to establish that he acted willfully to intercept oral communications. The district court correctly charged the jury on the element of willfulness. Considering the evidence, including Vinson's confrontations with Slack, his financing the purchase and installation of the electronic eavesdropping equipment, and his announced intentions of finding out why someone was out to get him, there was substantial evidence in the record to support the jury's finding that Vinson acted willfully to intercept oral communications.
 
 VI.
 
 26
 Vinson's final argument takes aim at the district court's application of U.S.S.G. Sec. 2J1.3(b)(2) to increase his offense level for the perjury conviction by three levels. At sentencing, the district court found, by a preponderance of the evidence standard, that Vinson's perjury before the grand jury had "a substantial interference with the administration of justice in that the perjurious statement ... resulted in the unnecessary expenditure of substantial government resources."
 
 
 27
 Based on the record before us, the district court's findings are supported by a preponderance of the evidence and are not clearly erroneous. United States v. Daughtrey, 874 F.2d 213 (4th Cir.1989).
 
 
 28
 The judgment of the district court is, accordingly,
 
 
 29
 AFFIRMED.
 
 
 
 [1]
 During a deposition given by Vinson in connection with a wrongful discharge suit he filed, he admitted that the Board had not known of his private management activity, and had not approved it
 
 
 [2]
 Vinson engaged in at least one additional surreptitious activity. After he had been fired, Vinson directed the janitor to bring the trash removed from KCHRA to Vinson's house in the evening. The janitor admitted that he complied with Vinson's demand, even though he felt "uncomfortable" about the practice, which occurred three or four times